PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

Nos. 07-2818, 07-2887, 07-2888 and 07-2904
———

UNITED STATES OF AMERICA;
GOVERNMENT OF THE VIRGIN ISLANDS

v.

REINALDO BERRIOS,

Appellant in 07-2818
———

UNITED STATES OF AMERICA;
GOVERNMENT OF THE VIRGIN ISLANDS

v.

ANGEL RODRIGUEZ,

Appellant in 07-2887
———

UNITED STATES OF AMERICA;
GOVERNMENT OF THE VIRGIN ISLANDS

v.

FELIX CRUZ,

Appellant in 07-2888
_____

UNITED STATES OF AMERICA;
GOVERNMENT OF THE VIRGIN ISLANDS

v.

TROY MOORE,

Appellant in 07-2904
_____

On Appeal from the District Court
of the Virgin Islands – Appellate Division
Division of St. Croix
(D.C. Nos. 1-04-cr-00105-001, 1-04-cr-00105-003,
1-04-cr-00105-004 and 1-04-cr-00105-002)
District Judge:  Honorable Raymond L. Finch
_____

Nos. 07-2818, 07-2887 and 07-2904
Argued December 6, 2011

No. 07-2888
Submitted December 6, 2011

Before:  FISHER, GREENAWAY, JR.

2

and ROTH, *Circuit Judges*.

(Filed: April 10, 2012)

Warren B. Cole (Argued)
Hunter, Cole & Bennett
1138 King Street, Suite 301
Christiansted, St. Croix, USVI  00820
        *Counsel for Appellant, Reinaldo Berrios*

Robert L. King (Argued)
Law Offices of Robert L. King
Windward Passage Hotel
P.O. Box 9768, Veterans Drive
Charlotte Amalie, St. Thomas, USVI  00801
        *Counsel for Appellant, Angel Rodriguez*

Jorge E. Rivera-Ortiz
P.O. Box 1845
Manati, PR  00674-1845
        *Counsel for Appellant, Felix Cruz*

Clive Rivers (Argued)
Nisky Center, Suite 233
Charlotte Amalie, St. Thomas, USVI  00801
        *Counsel for Appellant, Troy Moore*

John A. Romano (Argued)
United States Department of Justice
Appellate Section, Criminal Division
P.O. Box 899

Ben Franklin Station
Washington, DC  20044

Harry Wallace
Office of United States Attorney
99 Northeast 4th Street, 6th Floor
Miami, FL  33132
  *Counsel for Appellees*

––––––

OPINION OF THE COURT

––––––

FISHER, *Circuit Judge*.

  Reinaldo Berrios, Felix Cruz, Troy Moore, and Angel Rodriguez (together, "the defendants") appeal from judgments of conviction and sentence in the U.S. District Court for the District of the Virgin Islands arising out of a series of carjackings, an attempted robbery, and the murder of a security guard.  Between them, the defendants have raised a number of arguments on appeal, including evidentiary errors, prosecutorial misconduct, faulty jury instructions, sufficiency of the evidence, and double jeopardy.  We address the various contentions in turn, but focus our discussion on two principal issues:  clarifying our jurisprudence under the Confrontation Clause and its relationship to the Federal Rules of Evidence, and resolving a question of statutory interpretation under 18 U.S.C. § 924(c) and (j) with double jeopardy implications.  After thorough consideration of the arguments presented by both sides, we will affirm.

4

I.

A.  Factual History

On April 17, 2004, at 9:45 p.m., Lydia Caines was speaking on her cell phone in her car, a tan Chevy Cavalier, when a masked man exited a white Suzuki Sidekick with tinted windows and stuck a gun against the car's window. Caines dropped her phone and relinquished her vehicle, and both her car and the Sidekick were driven away.  Law enforcement learned that the Sidekick was owned by Reinaldo Berrios, who had been seen driving it earlier in the evening when he was ticketed by a traffic cop and later in the evening when he spoke to a police officer.  On April 18, Caines's phone was used to make calls to the family of Angel Rodriguez and to a friend of Troy Moore.

An hour later, three masked gunmen attempted to rob a Wendy's Restaurant, which Berrios had discussed with a friend earlier that day.  An off-duty police officer, Cuthbert Chapman, was working as a security guard for the Wendy's at the time; when he attempted to stop the robbery, the would-be robbers shot him repeatedly, and he died nine days later from his wounds.  Before leaving, one of the robbers yelled, "Troy, let we go," meaning, "Troy, let's go."  After the shooting, the robbers fled; two of them got into a champagne-colored Chevy Cavalier, which was being driven by an individual who had not entered the Wendy's.  The Cavalier crashed, severely damaging one of the wheels, and the occupants abandoned it.  When it was recovered, law enforcement determined that it was the stolen Cavalier, although the license plate had been switched and a side-view mirror was

5

missing. A mask, similar to the ones worn by the robbers, was found close to the vehicle. Threads found in the Chevy Cavalier were matched to the material of a jacket retrieved from Felix Cruz's room, and a fingerprint from Rodriguez was lifted off of the license plate.

Around 11:00 p.m., shortly after the Wendy's robbery and shooting, Shariska Peterson was confronted by three masked men as she was walking to her Honda Accord. As the men demanded the keys to her car, one of them pointed a gun at her head. Instead, Peterson threw them into the high grass in her yard, prompting one of the men to say, "You should not have done that," and then the three ran away. Peterson saw a fourth man join them as they left. Soon thereafter, four masked men stole Rita Division's Toyota Echo, which she had left running while she was locking up the gate at the high school where she worked. One of the men ordered her at gunpoint to stay away from the car. Her car was recovered a few days later; the original license plate for Caines's Chevy Cavalier and its missing side-view mirror were found nearby.

In July of 2004, a federal judge in the District Court of Puerto Rico approved a Title III surveillance application, pursuant to 18 U.S.C. §§ 2510 *et seq.*, to monitor conversations in a detention center in Guaynabo, Puerto Rico, as part of an unrelated investigation into criminal activity in which Berrios and Moore were involved (the "Title III recording"); both Berrios and Moore were in the detention center at the time. Surveillance was performed both through video and sound recording. Authorities intercepted a conversation between Berrios and Moore in a recreational

6

yard at the detention facility during which they discussed, in detail, the Wendy's shooting and getaway, and their respective roles in it. The defendants identified Rodriguez (by nickname) as the getaway driver, and blamed him for blowing out a tire and crashing the getaway car. During the conversation, Moore also threatened to kill an individual who worked at a store with his girlfriend and was getting "regularly question[ed]" by the police.

## B. Trial and Procedural History

On May 31, 2006, a federal grand jury in the District of the Virgin Islands returned a third superseding indictment charging each defendant with conspiracy and attempt to interfere with commerce by robbery, both in violation of 18 U.S.C. § 1951(a) (Counts 1 and 2, respectively); carjacking and attempted carjacking, both in violation of 18 U.S.C. § 2919(1) (Counts 3 and 10, and Count 8, respectively); using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Counts 4, 9 and 11); causing the death of a person through use of a firearm, in violation of 18 U.S.C. § 924(j)(1) (Count 6); first-degree felony murder, in violation of 14 V.I.C. §§ 922(a)(2) and 11 (Count 5); and unauthorized use of a firearm, in violation of 14 V.I.C. §§ 2253(a) and 11 (Count 7). On February 6, 2007, after a four-week trial, the jury found the defendants guilty on all charges. On July 8, the District Court entered judgments of acquittal on Counts Three (carjacking) and Four (use of a firearm during the carjacking) for the Caines incident, as to Moore, Rodriguez and Cruz, but otherwise denied defendants' motions for judgments of acquittal and a new trial.

7

Berrios was sentenced to life imprisonment and consecutive prison terms totaling 70 years on the federal counts, and to life imprisonment and a consecutive prison term of 15 years on the Virgin Islands counts, with local sentences to run consecutively to the federal sentences. Rodriguez, Cruz and Moore were sentenced to life imprisonment on the federal counts, and to life imprisonment and a consecutive 15-year prison term on the Virgin Islands counts, with local sentences to run consecutively to federal sentences. Each defendant was fined $50,000 for Count 7. The defendants filed timely notices of appeal.

## II.

The District Court had jurisdiction pursuant to 48 U.S.C. § 1612(a) and (c). We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.

The defendants raise six categories of error, which we address in turn:

    A.  Title III Evidence

    B.  Rule 404(b) Evidence

    C.  Sufficiency of the Evidence

    D.  Prosecutorial Misconduct

    E.  Jury Instructions

F. Double Jeopardy

After careful review, we find that none of the arguments raised by the defendants has merit.

## A. Title III Evidence

The Title III recording of the conversation between Berrios and Moore formed the cornerstone of the prosecution's case against Rodriguez, Cruz, and Moore, and these three defendants challenge admission of the recording on several grounds. Rodriguez and Cruz challenge the recording as a violation of their rights under the Confrontation Clause of the Sixth Amendment, and in the alternative, as inadmissible hearsay under the Federal Rules of Evidence. Moore contends that the Title III application was facially deficient, and therefore the recording should have been suppressed. Due to the confusion exhibited by the parties as to the proper scope of the Confrontation Clause, we will first clarify our Confrontation Clause jurisprudence with regards to testimonial versus nontestimonial statements, before proceeding to the admissibility of the recording against the three defendants. We exercise "plenary review over Confrontation Clause challenges," *United States v. Lore*, 430 F.3d 190, 208 (3d Cir. 2005), but review a nonconstitutional challenge to the admission of hearsay for abuse of discretion. *United States v. Riley*, 621 F.3d 312, 337 (3d Cir. 2010).

### 1. Confrontation Clause Challenges

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall

enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Until recently, the scope of the Confrontation Clause had been governed by the "indicia of reliability" test laid out by Justice Blackmun in *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980). Under *Roberts*, an absent witness's hearsay statement could be introduced against a criminal defendant only if the witness was unavailable at trial and the statement bore certain "indicia of reliability," either by "fall[ing] within a firmly rooted hearsay exception" or by showing "particularized guarantees of trustworthiness." *Id.* at 66. In *Crawford v. Washington*, 541 U.S. 36, 51 (2004), however, the Supreme Court observed that, at its core, the Confrontation Clause is concerned with "testimonial" hearsay. Abrogating *Roberts*, the *Crawford* Court adopted a per se rule that where *testimonial* hearsay is concerned and the declarant is absent from trial, the Confrontation Clause requires that the witness be unavailable and that the defendant have had a prior opportunity for cross-examination. *Id.* at 59, 68.

In subsequent decisions, the Court overruled *Roberts* in its entirety, holding without qualification that the Confrontation Clause protects the defendant *only* against the introduction of testimonial hearsay statements, and that admissibility of nontestimonial hearsay is governed solely by the rules of evidence. *See Davis v. Washington*, 547 U.S. 813, 823-24 (2006) (holding that, under *Crawford*, the Confrontation Clause protects only against admission of testimonial hearsay, because "a limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter");

10

*Michigan v. Bryant*, 131 S. Ct. 1143, 1152-53 (2011) (confirming that *Crawford* limits the reach of the Confrontation Clause to testimonial statements); *Whorton v. Bocking*, 549 U.S. 406, 419-20 (2007) ("Under *Crawford*, . . . the Confrontation Clause has no application to [out-of-court nontestimonial statements] and therefore permits their admission even if they lack indicia of reliability.").

We initially interpreted the *Crawford* decision to overrule *Roberts* only insofar as testimonial statements were concerned, but continued to apply the Confrontation Clause to nontestimonial hearsay through the *Roberts* indicia of reliability test. *See United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005) ("[U]nless a particular hearsay statement qualifies as 'testimonial,' *Crawford* is inapplicable and *Roberts* still controls."). To date, we have yet to circumscribe the Confrontation Clause to its core concern with testimonial hearsay, but have rather maintained that "nontestimonial statements do not violate the Confrontation Clause and are admissible as long as 'they are subject to a firmly rooted hearsay exception or bear an adequate indicia of reliability.'" *United States v. Jimenez*, 513 F.3d 62, 77 (3d Cir. 2008) (quoting *Albrecht v. Horn*, 485 F.3d 103, 134 (3d Cir. 2007)). To avoid needless confusion, we now expressly follow the Supreme Court's Confrontation Clause jurisprudence as laid out in the trilogy of *Davis*, *Whorton*, and *Bryant*: where nontestimonial hearsay is concerned, the Confrontation Clause has no role to play in determining the admissibility of

11

a declarant's statement.[1]  Accordingly, the "indicia of reliability" test of *Roberts* is no longer an appropriate vehicle for challenging admission of nontestimonial hearsay.[2]

---

[1] In light of intervening Supreme Court opinions, we are not bound by the cited panel decisions. *See Reich v. D.M. Savia Co.*, 90 F.3d 854, 858 (3d Cir. 1996) ("Although a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel, . . . a panel may reevaluate a precedent in light of intervening authority . . . ."). Moreover, *Jimenez* and *Albrecht* failed to cite the recently issued Supreme Court decisions that we now conclude govern the present case, and "[w]hile we strive to maintain a consistent body of jurisprudence, we also recognize the overriding principle that '[a]s an inferior court in the federal hierarchy, we are, of course, compelled to apply the law announced by the Supreme Court as we find it on the date of our decision.'" *United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009) (quoting *United States v. City of Philadelphia*, 644 F.2d 187, 192 n.3 (3d Cir. 1980)). Thus, we "'should not countenance the continued application in this circuit of a rule . . . which is patently inconsistent with the Supreme Court's pronouncements.'" *Id.* (quoting *Cox v. Dravo Corp.*, 517 F.2d 620, 627 (3d Cir. 1975)).

12

Thus, our Confrontation Clause inquiry is twofold. First, a court should determine whether the contested

---

<sup>2</sup> To say that *Roberts* is no longer applicable means, as a practical matter, that a challenge to the admission of nontestimonial hearsay previously within the scope of the Confrontation Clause has no constitutional foundation. For purposes of appellate review, this will require the application of a different standard of harmless error. *See United States v. Diallo*, 575 F.3d 252, 264 (3d Cir. 2009). However, it should not detract in any way from the scrutiny that nontestimonial hearsay receives under the rules of evidence. As the *Roberts* Court observed, "hearsay rules and the Confrontation Clause are generally designed to protect similar values, and stem from the same roots." 448 U.S. at 66 (internal marks and citations omitted). As admissibility under *Roberts* relied in part on the existence of a relevant "firmly rooted hearsay exception," it will often be the case that evidence courts would deem inadmissible under *Roberts* is also inadmissible under the rules of evidence. *See*, *e.g.*, *United States v. Mussare*, 405 F.3d 161, 168-69 (3d Cir. 2005) (determining admissibility under *Bruton* based on satisfaction of Federal Rule of Evidence 804(b)(3)).

13

statement[3] by an out-of-court declarant qualifies as testimonial under *Davis* and its progeny. Second, the court should apply the appropriate safeguard. If the absent witness's statement is testimonial, then the Confrontation Clause requires "unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68. If the statement is nontestimonial, then admissibility is governed *solely* by the rules of evidence. *Davis*, 547 U.S. at 823.

Applying this two-part test to the Title III recording at issue here, we have little hesitation in concluding that the recorded conversation was not testimonial, and thus not subject to Confrontation Clause scrutiny. Although we lack an authoritative definition of "testimonial," in *Hendricks*, 395 F.3d at 180-81, we addressed the admissibility of similar Title III recordings of conversations between various nontestifying defendants and third parties. After comparing these recordings to the examples which the Supreme Court stated were definitively testimonial, such as "prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and police interrogations," we reasoned that a "surreptitious" Title III recording neither qualified as "*ex parte* in-court

_____

[3] In scrutinizing a contested statement, we note that a trial court should consider not only whether the statement as a whole qualifies as testimonial, but also whether portions of the statement may qualify as testimonial, and therefore require redaction of otherwise admissible evidence. *See Davis v. Washington*, 547 U.S. 813, 829 (2006) (scrutinizing portions of contested statement separately to determine testimonial nature).

14

testimony or its functional equivalent," nor formalized "extrajudicial statements." *Id.* Cognizant that "a witness 'who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not,'" *id.* (quoting *Crawford*, 541 U.S. at 51), we concluded that "the surreptitiously monitored conversations and statements contained in the Title III recordings [we]re not 'testimonial' for purposes of *Crawford*."[4] *Id.*

It is likewise clear that, in the present case, the contested statements bear none of the characteristics exhibited by testimonial statements. There is no indication that Berrios

---

[4] Intervening Supreme Court cases have exclusively addressed which "interrogations by law enforcement officers fall squarely within [the] class of testimonial hearsay," *Michigan v. Bryant*, 131 S. Ct. 1143, 1153 (2011) (quoting *Davis*, 547 U.S. at 826), and have done nothing to sway us from this understanding. In *Davis*, the Court considered whether statements about domestic violence to law enforcement personnel during a 911 call or at a crime scene qualified as testimonial for Confrontation Clause purposes, 547 U.S. at 823, 829-30, and *Bryant* differed only insofar as the contested statements concerned a nondomestic dispute. 131 S. Ct. at 1156. The *Bryant* and *Davis* Courts held that statements for which "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution" are testimonial, but those made to enable police to meet an ongoing emergency are not. *Davis*, 547 U.S. at 822.

15

and Moore held the objective of incriminating any of the defendants at trial when their prison yard conversation was recorded; there is no indication that they were aware of being overheard; and there is no indication that their conversation consisted of anything but "casual remark[s] to an acquaintance." *Crawford*, 541 U.S. at 51. Nor do we think that a surreptitious recording falls within the category of "abuses" which, historically, the Framers were concerned about eradicating from the government's investigative practices. *See id.* Consequently, we reject any suggestion that, in this circumstance, the Title III recording was testimonial,[5] and therefore that the Confrontation Clause

---

[5] Of course, it is possible that participants in a recorded conversation might be aware that they are being recorded, and intentionally incriminate another individual. By no means are we establishing a categorical rule: simply because we have found *some* Title III recordings to be nontestimonial does not mean that *no* Title III recordings can qualify as such. Rather, each statement should be scrutinized on its own terms to determine whether it exhibits the characteristics of a testimonial statement. *See Bryant*, 131 S. Ct. at 1156 ("To determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' which would render resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." (quoting *Davis*, 547 U.S. at 822)). There may be some instances, such as where the primary purpose of the declarant's interlocutor was to elicit a testimonial statement, such that even if the declarant's purpose was innocent, the

16

affords protection against the introduction of such evidence at the defendants' trial.

Our conclusion that the contested statements were nontestimonial under *Davis* compels us to reject the challenges levied by Rodriguez and Cruz under *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the Court held that the Confrontation Clause bars the use of the confession of a nontestifying criminal defendant in a joint trial to the extent that it directly inculpates a co-defendant, though it might be otherwise admissible against the confessing defendant. *Id.* at 126. "We have interpreted *Bruton* expansively, holding that it applies not only to custodial confessions, but also when the statements of the non-testifying co-defendant were made to family or friends, and are otherwise inadmissible hearsay." *United States v. Mussare*, 405 F.3d 161, 168 (3d Cir. 2005) (citing *Monachelli v. Graterford*, 884 F.2d 749, 753 (3d Cir. 1989), and *United States v. Ruff*, 717 F.2d 855, 857-58 (3d Cir. 1983)). However, because *Bruton* is no more than a by-product of the Confrontation Clause, the Court's holdings in *Davis* and *Crawford* likewise limit *Bruton* to testimonial statements. *See*, *e.g.*, *United States v. Wilson*, 605 F.3d 985, 1017 (D.C. Cir. 2010) (holding that alleged *Bruton* claim did not violate the Confrontation Clause because the statements were not testimonial). Any protection provided by *Bruton* is therefore only afforded to the same extent as the Confrontation Clause, which requires that the challenged statement qualify as

conversation as a whole would be testimonial. Nevertheless, we are not presented with such a situation here.

17

testimonial.  To the extent that we have held otherwise, we no longer follow those holdings.  *See Monachelli*, 884 F.2d at 753 (holding that *Bruton* applies to statements "made in a non-custodial setting to family and friends"); *Ruff*, 717 F.2d at 857-58 (same).  And because, as discussed above, we have found the Title III recordings not to constitute testimonial hearsay, *Bruton* provides no solace for Rodriguez or Cruz.

2.  Challenges under the Federal Rules of Evidence

Following the two-step framework articulated above, having determined that the challenged recording is nontestimonial and therefore that the Confrontation Clause challenges are not viable, we move next to the admissibility of the Title III recording against Cruz and Rodriguez under the Federal Rules of Evidence.  We may affirm the District Court on any ground supported by the record.  *Mussare*, 405 F.3d at 168.

Rodriguez contends that the Title III recording was inadmissible hearsay as to him, but we agree with the government that the recording was admissible under Rule 804(b)(3) as a statement against penal interest.  Although we are sensitive to the possibility that self-serving incriminating statements uttered by a non-testifying co-defendant may be inherently untrustworthy, "[w]here statements inculpate both the speaker and the defendant challenging their admission, the statements are admissible so long as they were 'self-inculpatory' and not simply self-serving attempts to deflect criminal liability."  *Id.* at 168 (quoting *United States v. Moses*, 148 F.3d 277, 281 (3d Cir. 1998)).  In *Mussare*, we considered the admission of similar braggadocio by a non-

18

testifying codefendant, who had boasted to a witness that he and the defendant had performed the illegal acts underlying the criminal charges. *Id.* We found that because the co-defendant did not attempt to "deflect liability," but rather "took credit" for it, the statements were not inadmissible hearsay. *Id.*[6]

*Mussare* squarely governs here. In the Title III recording, Berrios and Moore unequivocally incriminate themselves in the carjackings and the Wendy's murder. Rather than attempting to "deflect liability" to Rodriguez, they take full credit for the Wendy's murder, bragging about shooting the security guard, and mentioning Rodriguez only to complain that he crashed the getaway car. In no way was the recorded conversation "self-serving," and therefore we will uphold the District Court's ruling as to its admissibility against Rodriguez.

Cruz's challenge is equally straightforward because Berrios and Moore never blame Cruz for any criminal conduct, or even mention him by name. Moreover, Moore's threat to kill a man who worked with his girlfriend, and who was evidently talking to the police, did not clearly refer to Cruz, as Cruz himself concedes (and the government never attempted to argue that it did). Thus, Cruz cannot contend that Berrios or Moore attempted to deflect any criminal liability in his direction during their conversation. *See*

---

[6] In *Mussare*, 405 F.3d at 168-69, we went on to determine admissibility under *Bruton*, which, as discussed in the preceding section, is no longer applicable in this situation.

19

*Mussare*, 405 F.3d at 168.  Rather, the challenged statements are entirely self-inculpatory, and consequently admissible against Cruz under Rule 804(b)(3).  *See id.*

### 3.  Sufficiency of the Title III Application

Moore offers a curious argument that the Title III application submitted by the investigating prosecutor was facially deficient because the prosecutor was not admitted to practice in Puerto Rico, the jurisdiction where the warrant was obtained.  We find that this argument was waived under Federal Rule of Criminal Procedure 12.

"[U]nder Rule 12, a suppression argument raised for the first time on appeal is waived (*i.e.*, completely barred) absent good cause," including when the defendant filed a suppression motion but failed to include the specific issues raised on appeal.  *United States v. Rose*, 538 F.3d 175, 177, 182 (3d Cir. 2008).  *Rose* concerned evidence which the defendant sought to suppress under the Fourth Amendment on the grounds that the warrant was facially deficient, *id.* at 176-77, but in light of the expansive language of Rule 12(b)(3)(C), which applies broadly to "a motion to suppress," we find it equally appropriate to apply this waiver rule in the Title III context.  *See*, *e.g.*, *United States v. Kincaide*, 145 F.3d 771, 778 (6th Cir. 1998) (holding that failure to seek suppression of Title III wiretap evidence waived claim on appeal under Rule 12); *United States v. Torres*, 908 F.2d 1417, 1424 (9th Cir. 1990) (same).  Thus, although Moore submitted a pre-trial motion to suppress the wiretap evidence, that motion preserved only those arguments which he specifically raised, and he did not raise this purported

20

deficiency.  Nor can Moore offer any argument as to why he was unable to make a proper motion, or contend that he was unaware of this potential basis for suppression, as would warrant a waiver exception under 18 U.S.C. § 2518(10)(a): his co-defendant, Berrios, moved for a new trial based on the purported deficiency in the Title III application, which Moore did not join.  The argument was accordingly waived under Rule 12, and because the plain error doctrine is inapplicable, *see Rose*, 538 F.3d at 177, we do not reach its dubious merits.

## B.  Other Acts Evidence

Berrios challenges the government's introduction at trial of statements he made in response to police questioning regarding loose ammunition in his home, as well as photographs of the ammunition, under Federal Rule of Evidence 404(b).  We review the admission of evidence under Rule 404(b) for abuse of discretion.  *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001).  The government contends that this evidence demonstrated consciousness of guilt as part of a pattern of exculpatory statements he made to the police during the investigation of the Wendy's shooting. We disagree, but the error was harmless.

### 1.  Admissibility under Rule 404(b)

Extrinsic bad acts evidence may not be introduced "to prove a person's character in order to show that on a particular occasion the person acted in accordance with that character."  Fed. R. Evid. 404(b).  Berrios correctly observes that his unlawful possession of ammunition constitutes such a

21

bad act, and contends that the government introduced it for the improper purpose of showing his violent tendencies.

We have acknowledged that false exculpatory statements may be introduced as evidence of the defendant's consciousness of guilt of the underlying charges, even where such conduct may itself violate the law. *See United States v. Kemp*, 500 F.3d 257, 296 (3d Cir. 2007); *United States v. Levy*, 865 F.2d 551, 558 (3d Cir. 1989). For example, in *Kemp*, we rejected a Rule 404(b) challenge to the use of false grand jury testimony, which the government used to disprove the defendant's "alibi" that he was, in essence, too wealthy to have committed the charged money laundering offenses. 500 F.3d at 296-97. Despite the defendant's contention that the government was attempting to show that he was lying on the stand because he had lied in the grand jury, we found that, as a false exculpatory statement, this evidence properly demonstrated consciousness of guilt. *Id.* Similarly, in *Levy*, we found that a defendant's attempt to conceal his or her identity after committing a crime was admissible to show consciousness of guilt, even where the defendant's use of false identities may have violated "international travelling statutes." *Levy*, 865 F.2d at 558.

The government hangs its hat on the contention that Berrios's statements qualify under the consciousness of guilt exception to Rule 404(b) because they are, generally speaking, exculpatory, and were made during the investigation of the Wendy's shooting. Thus, the government calls this part of a "pattern" of false exculpatory statements, the entirety of which is relevant to show consciousness of guilt. We disagree. Although the statements concerned a

22

collection of unused ammunition which garnered attention during an investigation of the charged offenses, the connection between this statement and consciousness of guilt is simply too attenuated. In both *Kemp* and *Levy*, the false exculpatory statements were directly related to the charged offense, thereby falling squarely within the kind of conduct traditionally demonstrating consciousness of guilt. However, neither *Levy* nor *Kemp* suggests that a false exculpatory statement made to deflect criminal liability for *unrelated* conduct may also be introduced for such purposes, and we decline to hold so here. Indeed, such an expansive interpretation of the consciousness of guilt exception would effectively eviscerate the rule itself: any time that the government sought to introduce other bad acts evidence, it could circumvent Rule 404(b) by admitting the defendant's false exculpatory statements about that conduct.

We have said that "[t]o show a proper purpose, the government must clearly articulate how that evidence fits into a chain of logical inferences without adverting to a mere propensity to commit crime now based on the commission of crime then." *Kemp*, 500 F.3d at 296 (internal quotations omitted). The government has failed to do so, and therefore, as the District Court recognized in its post-trial opinion, the evidence should have been excluded under Rule 404(b).

### 2. Harmless Error

Nevertheless, the District Court correctly concluded that the purported error was harmless because "the jury learned that no similar ammunition was found at Wendy's" and the "alleged falsehood was cumulative to other false and

23

contradictory statements that Berrios made during the same interrogation that bore directly on his consciousness of guilt concerning the Wendy's incident." Where evidence is improperly admitted, reversal is not required where it is "highly probable that the error did not contribute to the judgment." *United States v. Cross*, 308 F.3d 308, 326 (3d Cir. 2002) (internal quotation omitted). "Under the highly probable standard, . . . there is no need to disprove every reasonable possibility of prejudice," and "we can affirm for any reason supported by the record." *Id.* (internal marks and quotations omitted). In the present case, we may comfortably conclude that the harmless error standard is satisfied.

First and foremost, the evidence against Berrios was so overwhelming that any improper inferences the jury might have drawn from the ammunition evidence were marginal, at most. *See id.* Second, the jury learned that none of the ammunition found at Berrios's home resembled the ammunition found at the Wendy's, so would not likely have conflated the two. Third, minimal prejudice would have resulted from the jury's consideration of the ammunition evidence in light of the court's instructions not to base its verdict on any uncharged acts and, as is oft repeated, "juries are presumed to follow their instructions." *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 541 (1993)). And fourth, the government presented other statements from the same conversation which properly demonstrated consciousness of guilt of the charged offense, so any inference that the jury might have improperly drawn from this evidence was cumulative of the balance of other consciousness of guilt

24

evidence. *See id.* Thus, the District Court was correct in determining that a new trial was not warranted on this basis.

## C. Sufficiency of the Evidence

Cruz, Rodriguez and Moore renew their sufficiency of the evidence challenges previously made in post-trial motions. We exercise plenary review over a district court's denial of a motion for judgment of acquittal based on the sufficiency of the evidence. *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009). The verdict must be sustained if "any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008). We review for plain error where the defendant failed to make a timely motion for judgment of acquittal. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Making all reasonable inferences in favor of the government as the verdict winner, *Starnes*, 583 F.3d at 206, we find these challenges meritless.

## 1. Cruz

Cruz submits that the government failed to prove beyond a reasonable doubt that he was one of the perpetrators of the charged crimes. Cruz moved for judgment of acquittal at the close of trial under Rule 29. The District Court correctly denied the motion as to Cruz's involvement in all but the Caines carjacking because, based on physical evidence, witness testimony, and post-offense conduct, a reasonable jury could have found him to be a participant in

25

the robbery, shooting and carjackings beyond a reasonable doubt. *Silveus*, 542 F.3d at 1002.

First, Cruz was tied to the crimes through fibers found in the Chevy Cavalier which matched a dark blue Nike jacket recovered from his room. The government's expert testified that it was "very unlikely" that fibers consistent with a garment would not originate from that garment, particularly given the "over 80 billion tons of fibers produced each year." Additionally, the jury could reasonably infer that the jacket belonged to Cruz because, when told to dress, he put on pants from the room where the jacket was found. Second, witnesses placed Cruz in the company of the other conspirators shortly before the attempted robbery. Angel Ayala testified that at around 7 p.m., Cruz and Rodriguez had talked with him about holding a gun and that they were wearing black and blue sweaters with blue hoods. Tyiasha Moore likewise testified that Rodriguez, Cruz and Berrios were gathered around a gun, all wearing dark clothing, one floor away from Moore, at around 10:15 p.m. that night. And third, Armando Cruz, a government witness, confronted Cruz several times about the Wendy's shooting. Cruz never denied his involvement in the crime until the third conversation, at which point Armando believed he had grown suspicious about Armando's assistance in the investigation. Making all reasonable inferences in favor of the government as the verdict winner, *Starnes*, 583 F.3d at 206, Cruz cannot show that no reasonable jury could have convicted him on the totality of the evidence.

## 2. Rodriguez

Rodriguez contends that the evidence was insufficient as a matter of law to convict him of the charges. However, the tape of Berrios and Moore identifying Rodriguez as the getaway driver for the Wendy's robbery and as an accomplice in the carjackings was properly admitted, and he rightly concedes that if the recording was admissible against him, the evidence was sufficient for a conviction. Rodriguez also argues that a jury could not find him guilty of attempting to carjack Peterson's car because none of the defendants harmed her in any way after she threw her keys into her yard. However, the specific intent element of carjacking is assessed at the time the defendant "demanded or took control over the car." *See Holloway v. United States*, 526 U.S. 1, 8 (1999). Therefore, the fact that Peterson was not harmed does not negate the jury's assessment of Rodriguez's intent *at the time* the carjackers demanded the keys. Indeed, Peterson testified that they ran away when neighborhood dogs began to bark, which suggests that the defendants may very well have changed their minds during the carjacking. Drawing all reasonable inferences in favor of the verdict, Rodriguez cannot prevail merely because the victim escaped unharmed.

## 3. Moore

Moore argues that the evidence was insufficient to prove that he was an accomplice in the Wendy's robbery and carjackings, but concedes that if the recording of his conversation with Berrios was properly admitted, his sufficiency of the evidence argument must fail. We reject his challenge accordingly.

27

D. Prosecutorial Misconduct

Several of the defendants have appealed on the grounds of prosecutorial misconduct. Cruz submits that the prosecution improperly vouched for a government witness, and, along with Rodriguez and Moore, contends that prosecutorial conduct during closing requires reversal.

1. Vouching

Cruz argues that Detective Matthews vouched for witnesses Tyiasha Moore and Angel Ayala by testifying that their grand jury testimony was consistent with their prior statements, and by confirming that he told them to tell the truth at the grand jury proceeding. We review an unpreserved vouching claim for plain error. *See United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006). If petitioner preserved the claim, we review for abuse of discretion. *United States v. Vitillo*, 490 F.3d 314, 325 (3d Cir. 2007).

"Vouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." *United States v. Walker*, 155 F.3d 180, 184 (3d Cir. 1998) (citations omitted). Such conduct threatens to "convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant," thereby "jeopardiz[ing] the defendant's right to be tried solely on the basis of the evidence presented to the jury," and "induc[ing] the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* For a prosecutor's conduct to constitute

28

vouching, (1) "the prosecutor must assure the jury that the testimony of a Government witness is credible," and (2) "this assurance [must be] based on either the prosecutor's personal knowledge, or other information not contained in the record." *Id.* at 187.

The government is not immunized from this attack merely because the challenged vouching occurred through the use of witness testimony. Although "vouching most often occurs during summation, . . . [it] may occur at any point during trial," including witness examination, when the elicited testimony satisfies the two criteria for vouching. *Vitillo*, 490 F.3d at 328. In *Vitillo*, for example, prosecutors referred to their presence at the defendant's interview by using the pronoun "we" when examining a government agent about what the defendant had admitted to the government. *Id.* at 329. We concluded that, through their questions, the prosecutors effectively "assured the jury that [the witness's] testimony was credible based on their personal observations of [his] interrogation of [the defendant]." *Id.* As such, it constituted improper vouching. *Id.*

In this case, however, the concerns underlying the vouching prohibition were not implicated by the examination of Detective Matthews. Although the government elicited Matthews's testimony to assure the jury that Tyiasha Moore and Angel Ayala were credible, it did not do so based on information outside of the record. Moreover, the jury could not glean anything about the prosecutor's personal knowledge of the grand jury proceedings. Thus, at no point did the prosecutor imply that the jury should disregard the evidence

29

in favor of the government's undisclosed knowledge or judgment. *See Walker*, 155 F.3d at 184.

Moreover, where the purported vouching is a "reasonable response to allegations of [impropriety]" by the defense, it is not improper. *United States v. Weatherly*, 525 F.3d 265, 272 (3d Cir. 2008); *see also United States v. Gentles*, 619 F.3d 75, 84-85 (1st Cir. 2010). For instance, in *Weatherly*, we allowed the prosecutor a "brief and appropriate response" during closing to the defense's "speculation and attacks on the credibility of government witnesses." *Id.* The examination of Detective Matthews was also such a response. The defense had elicited testimony that Moore had testified at the grand jury under coercive conditions. It was eminently appropriate for the prosecution to respond by introducing testimony to rehabilitate. *Cf. United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006). We reject Cruz's argument accordingly.

2. Closing Argument

Cruz, Moore and Rodriguez also challenge the fairness of the trial on the grounds that prosecutorial misconduct during closing jeopardized their right to a fair trial. The alleged misconduct includes the reading of a poem

30

commemorating the victim, Officer Chapman,[7] as well as the use of an enlarged photograph of the victim and brief references to Rodriguez's presence in jail. We review a district court's rulings on contemporaneous objections to closing arguments for abuse of discretion. *United States v. Lore*, 430 F.3d 190, 210 (3d Cir. 2005). Any non-contemporaneous objections are reviewed for plain error. *United States v. Lee*, 612 F.3d 170, 193 (3d Cir. 2010). A nonconstitutional error "requires reversal unless the error is harmless." *Id.* at 194.

We agree that the closing was rife with misconduct, and to a degree that should not be tolerated by a district court. The reading of a commemorative poem could truly serve no purpose other than to appeal to the emotions and sympathies of the jury, *see Viereck v. United States*, 318 U.S. 236, 247-48 & n.3 (1943); a criminal trial may prove cathartic for a victim's friends and family, but the courtroom is not an appropriate forum for a memorial. If, as the government

---

[7] The poem read at trial consisted of the following: "To Officer Chapman, I bid you farewell, a man and a hero I never knew well. Like those before him, he answered the call, out gunned and out flanked, he was destined to fall. But the job he chose never promised long life, just respect from others whom he protected from strife. He went without fear into that night. Against crime and evil he fought the good fight. On an April night he did all that he could. He sacrificed his life to fight bad with good. In the face of a gun he showed steely nerve, and he kept his promise to protect and to serve."

contends, the poem merely reiterated evidence that had been elicited at trial, then the government can simply discuss that evidence with the jury. The same goes for the puzzle of Officer Chapman's face, which the government submits was meant to show the jury how disparate pieces of evidence fit together. Visual aids can often help in conveying difficult concepts to a jury, particularly in a factually complex case such as this. *See*, *e.g.*, *United States v. De Peri*, 778 F.2d 963, 979 (3d Cir. 1985) (approving use of a chart to diagram relationships). But if that were truly the sole purpose behind the puzzle imagery, there was no such conceivable purpose in using an enlarged photograph of the victim's face as the puzzle image. Considered jointly with the poem, the purpose of the government's conduct is transparent and its justifications are not credible; such conduct should not have been allowed in court.[8]

Nevertheless, a "'criminal conviction is not to be lightly overturned on the basis of a prosecutor's [conduct] standing alone . . . .'" *Lee*, 612 F.3d at 194 (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)). Rather, "we 'must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant[s].'" *Id.* (quoting *Moore v.*

---

[8] The Government also concedes that the references to Rodriguez's presence in jail, both in mentioning his shackles and his prison letters to his girlfriend, were error. However, because these were minor incidents, we focus our analysis on the more troubling instances of misconduct.

*Morton*, 255 F.3d 95, 107 (3d Cir. 2001)); *United States v. Gambone*, 314 F.3d 163, 179 (3d Cir. 2003). "A prosecutor's [conduct] can create reversible error if [it] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Lee*, 612 F.3d at 194 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

In the present case, when examined in context and in light of the entire trial, the prosecutor's conduct does not merit reversal. First, the objectionable poem was a mere ten lines out of over seventy-five pages of closing argument by the prosecution and thousands of pages of trial transcript; we have found prejudice to be minimal from similarly brief comments. *See Gambone*, 314 F.3d at 180 (finding no prejudice where comments took up less than half a page out of 3200 pages of trial transcript); *United States v. Zehrbach*, 47 F.3d 1252, 1267 (3d Cir. 1995) (finding no prejudice where comments were two sentences in a forty-page closing argument). The same applies to the photograph of Officer Chapman, which had already been presented as evidence to the jury in its original form and, in the context of the entire trial, was displayed during an equally brief period of time.[9] Second, instructions by the judge, though not issued directly in response to the poem, sufficiently removed any lingering prejudice. *See United States v. Wood*, 486 F.3d 781, 789 (3d Cir. 2007) (finding opening and closing jury instructions to

---

[9] The government conceded at oral argument that its stance on this issue might be different if the photograph and poem were presented simultaneously, but because that was not the case, we see no need to address that possibility.

consider only the evidence, which did not include argument by counsel, sufficient, even without issuing an express curative instruction for the challenged comment); *Gambone*, 314 F.3d at 180 (same). As in *Wood*, the judge in this case instructed the jury repeatedly to base its judgment on the evidence, not on sympathy or bias,[10] and that arguments by counsel do not constitute evidence. These instructions were likewise an adequate response to the possibility that the improper commentary would lead the jury astray in its deliberations. Moreover, the jury was already aware of the nature of the crime and the identity of the victim, and therefore would have been exposed to the passion and sympathy elicited by the poem throughout the trial. *See Duvall v. Reynolds*, 139 F.3d 768, 795 (10th Cir. 1998). Finally, the jury was presented with ample evidence on which it could convict the defendants, *see Wood*, 486 F.3d at 789, and, as the District Court noted, the poem itself was "interlaced" with evidence adduced at trial. *See Gambone*, 314 F.3d at 179 (reaffirming prior holdings "that probative evidence on the same issue as improper remarks may mitigate

---

[10] Specifically, the District Court instructed the jury that it was "to perform [its] duties without sympathy, without bias, and without prejudice to any party," because "[o]ur system of law does not permit jurors to be governed or affected by bias, sympathy or prejudice." The District Court also emphasized that "[u]nder no circumstances . . . should [the jury's] deliberations be affected or diverted by any appeals to bias, passion, or prejudice, nor influenced by any pity or sympathy in favor of either side."

34

prejudice stemming from those remarks"). However prejudicial the photo and poem may seem in isolation, when viewed in context of the entire trial, prejudice was minimal and reversal is not warranted.

## E.  Jury Instructions

In its charge on the specific intent element of carjacking,[11] the District Court instructed the jury that "whether the Defendant 'intended  to cause death or serious bodily harm' is to be judged objectively from the conduct of the Defendant as disclosed by the evidence, and from what one in the position of the alleged victim might reasonably conclude."  Berrios contends that by emphasizing the perspective of the victim, these instructions established a subjective standard allowing the jury to find the intent element satisfied based only on an "empty threat" or "intimidating bluff," thereby "render[ing] superfluous the statute's 'by force and violence or intimidation' element." *Holloway v. United States*, 526 U.S. 1, 11 (1999).  We

---

[11] The four elements of carjacking, as instructed by the District Court, were:  (1) "That the Defendant took a motor vehicle from the person or presence of another"; (2) "That the Defendant did so by force or violence, or by intimidation"; (3) "That the motor vehicle previously had been transported, shipped, or received in interstate or foreign commerce"; and (4) "That the Defendant intended to cause death or serious bodily harm when the Defendant took the vehicle."  This accords with circuit practice.  *See United States v. Applewhaite*, 195 F.3d 679, 684-85 (3d Cir. 1999).

exercise plenary review in determining "whether the jury instructions stated the proper legal standard." *United States v. Leahy*, 445 F.3d 634, 643 (3d Cir. 2006) (citation omitted). We review the particular wording of the instructions for abuse of discretion. *Id.* (citation omitted). Although an "an empty threat, or intimidating bluff . . . is not enough to satisfy [carjacking's] specific intent element," *Holloway*, 526 U.S. at 11, when read in the context of the charge as a whole, the jury instructions were proper.

Jury instructions "'may not be evaluated in artificial isolation,'" but rather "'must be evaluated in the context of the overall charge.'" *United States v. Williams*, 344 F.3d 365, 377 (3d Cir. 2003) (quoting *United States v. Goldblatt*, 813 F.2d 619, 623 (3d Cir. 1987)). Thus, an instruction that appears erroneous on its own may be remedied by the balance of the court's instructions. *See id.* In *Williams*, for example, the defendant contested the use of the word "emboldening" in jury instructions on the "carry" and "possession" prongs of a § 924(c) violation. *Id.* We found no error, because the stray term was "included as part of a thorough instruction that sufficiently tracked language used by the Supreme Court." *Id.* at 377-78. Likewise, in *United States v. Khorozian*, 333 F.3d 498, 508 (3d Cir. 2003), we rejected the defendant's contention that an intent instruction for bank fraud "emasculated" the specific intent requirement. Although the challenged statement, "taken out of context," did "not employ the exact language" from our established definition of intent, the instruction as a whole "communicate[d] to the jury that it must find that [the defendant] possessed the specific intent to defraud . . . ." *Id.*

36

At the outset, of course, it is apparent that the challenged clause did not set forth a "subjective standard," as Berrios contends, but rather an objective reasonable person standard. Objective standards are often defined as what a reasonable person under the circumstances would believe or understand. *See*, *e.g.*, *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011) ("By limiting analysis to the objective circumstances of the interrogation, and asking how a reasonable person in the suspect's position would understand his freedom . . . to leave, the objective test [for custody under *Miranda*] avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind."); *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (holding that "seizure" for Fourth Amendment purposes objectively occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"). And despite Berrios's contentions otherwise, a "reasonable person in the victim's position" standard is distinguishable from the victim's subjective belief: even where a victim who is easily intimidated might be subjectively fearful, a jury employing this standard must discern whether a reasonable person in that position would find the defendant possessed the requisite intent.

Even if a juror might mistake the challenged clause as a subjective standard, the instructions as a whole tracked the correct standard for specific intent. We have said that a defendant's specific intent is to be judged "[b]ased upon the totality of *all* the surrounding facts and circumstances,"

*United States v. Anderson*, 108 F.3d 478, 485 (3d Cir. 1997) (applying specific intent standard for carjacking) (emphasis added); *see Polsky v. Patton*, 890 F.2d 647, 650 (3d Cir. 1989) (discussing intent standard for third degree murder), and not "by the secret motive of the actor, or some undisclosed purpose merely to frighten, not to hurt." *United States v. Guilbert*, 692 F.3d 1340, 1344 (11th Cir. 1982) (quoting *Shaffer v. United States*, 308 F.2d 654, 655 (5th Cir. 1962)).  The instructions here invited the jury to consider the facts in precisely this way:  "objectively from the conduct of the Defendant as disclosed by the evidence, and from what one in the position of the alleged victim might reasonably conclude."  The clause which Berrios highlights, read in context, does no more than provide one of the evidentiary factors the jury could consider in reaching its verdict.  The fact that the clause appears in the second half of the sentence, connected by an "and," confirms its role as a descriptive example rather than a discrete instruction which contradicts the initial one. *See United States v. Gordon*, 290 F.3d 539, 545 (3d Cir. 2003) ("[A] defect in a charge may result in legal error if the rest of the instruction contains language that merely contradicts and does not explain the defective language in the instruction.").  Thus, read as a whole, the instruction did not direct the jury to rely on the victim's subjective perception, and therefore, did not run the risk of allowing a conviction based on empty threats or bluffs.

38

F.  Double Jeopardy

Berrios was convicted under Virgin Islands law for first-degree (felony) murder, 14 V.I.C. § 922(a)(2),[12] and under federal law, 18 U.S.C. § 924(j)(1),[13] both premised on the killing of Officer Chapman.  He was sentenced to consecutive terms of life imprisonment, which he challenges as a violation of the Fifth Amendment's Double Jeopardy

---

[12] The text of § 922(a)(2), in relevant part, defines first degree murder as "(a) All murder which . . . (2) is committed in the perpetration or attempt to perpetrate arson, burglary, kidnapping, rape, robbery or mayhem, assault in the first degree, assault in the second degree, assault in the third degree and larceny."

[13] The text of § 924(j)(1) provides, in relevant part:  "A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall--(1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and (2) if the killing is manslaughter (as defined in section 1112), be punished as provided in that section."

Clause.[14]  Our review is plenary.  *See United States v. Bishop*, 66 F.3d 569, 573 (3d Cir. 1995).

"With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."  *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).  "Where Congress intended . . . to impose multiple punishments, imposition of such sentences does not violate the Constitution."  *Albernaz v. United States*, 450 U.S. 333, 344 (1981).  Accordingly, a Double Jeopardy challenge must fail if the statutory text clearly reflects a legislative intent to impose multiple sentences on a defendant for a single underlying transaction.  *See id.* at 344 & n.3; *Bishop*, 66 F.3d at 573-74.  If, after inspection, Congress's intent remains unclear, cumulative sentencing poses no double jeopardy problem only if "each provision requires proof of a fact which the other does not," thereby satisfying *Blockburger v. United States*, 284 U.S. 299 (1932).  *Bishop*, 66 F.3d at 573 (quoting *Blockburger*, 284 U.S. at 304).  However, "[b]ecause the [*Blockburger*] rule 'serves as a means of discerning congressional purpose[, it] should not be controlling where, for example, there is a clear indication of contrary legislative intent.'"  *United States v.*

---

[14] "The Virgin Islands and the federal government are considered one sovereignty for the purposes of determining whether an individual may be punished under both Virgin Islands and United States statutes for a similar offense growing out of the same occurrence."  *Gov't of the V.I. v. Braithwaite*, 782 F.2d 399, 406 (3d Cir. 1986).

40

*Conley*, 37 F.3d 970, 975-76 (3d Cir. 1994) (third alteration in original) (quoting *Albernaz*, 450 U.S. at 340).

The parties agree that, because felony murder in the Virgin Islands is a lesser included offense of 18 U.S.C. § 924(j), *Blockburger* is not satisfied. The question we are faced with is whether, by expressly requiring a § 924(c) violation before imposing a § 924(j) penalty, Congress also intended § 924(j) to incorporate subsection (c)'s consecutive sentence mandate, § 924(c)(1)(D)(ii). This is a question which has divided our sister circuits. *Compare United States v. Dinwiddie*, 618 F.3d 821, 837 (8th Cir. 2010) (holding that consecutive sentence provision under § 924(c) applies to sentences imposed under § 924(j)), *and United States v. Battle*, 289 F.3d 661, 665-69 (10th Cir. 2002) (same), *with United States v. Julian*, 633 F.3d 1250, 1252-57 (11th Cir. 2011) (holding that § 924(j) defines a distinct offense from § 924(c) and is not subject to consecutive sentence mandate). We conclude that Congress did so intend, and will therefore deny Berrios's double jeopardy challenge.

## 1. The Statutory Scheme

As is customary in cases of statutory interpretation, "our inquiry begins with the language of the statute and focuses on Congress'[s] intent." *United States v. Abbott*, 574 F.3d 203, 206 (3d Cir. 2009). "Because statutory interpretation . . . is a holistic endeavor," we do "not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute." *United States v. Cooper*, 396 F.3d 308, 313 (3d Cir. 2005) (internal marks and quotations omitted).

41

The text of 18 U.S.C. § 924(j) reads as follows:

"A person who, *in the course of a violation of subsection (c)*, causes the death of a person through the use of a firearm, shall—

>> (1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life, and

>> (2) if the killing is manslaughter (as defined in section 1112), be punished as provided in that section."

18 U.S.C. § 924(j) (emphasis added). By virtue of the subsection (c) cross-reference, we will begin, counter-intuitively, with § 924(c).

We have explored the mechanics of 18 U.S.C. § 924(c) more fully elsewhere, *see Abbott*, 574 F.3d at 206-08; *Bishop*, 66 F.3d at 573-75, but briefly revisit it here. In its prefatory clause, subsection (c) begins by identifying a core set of predicate offenses, crimes of violence and drug trafficking crimes, which fall within its scope. *See* § 924(c)(1)(A). The prefatory clause then provides that a defendant who commits a predicate offense while using, carrying or possessing a firearm, is subject to a mandatory punishment "in addition to" the sentence for that predicate offense. *Id.* Subsection (c)

also makes clear that "no term of imprisonment imposed on a person under . . . subsection [(c)] shall run concurrently with *any other term of imprisonment* imposed on the person . . . ."[15] § 924(c)(1)(D)(ii) (emphasis added) (the "consecutive sentence mandate"). The Supreme Court – along with every Court of Appeals to address the question, including our own – has unequivocally held that "[w]hen a defendant violates § 924(c), his sentencing enhancement under that statute *must run consecutively to all other prison terms.*" *United States v. Gonzales*, 520 U.S. 1, 9-10 (1997) (emphasis added); *see*, *e.g.*, *Bishop*, 66 F.3d at 574-75 ("'[T]he legislative intent to impose a consecutive sentence for the violation of section 924(c) is plain from the language

---

[15] Although the scope of § 924(c)(1)(D)(ii) substantially overlaps with that of subsection (c)'s prefatory clause, § 924(c)(1)(A), the consecutive sentence mandate applies to "*any other term of imprisonment imposed*," thereby reaching more broadly than the language of the prefatory clause, which only mandates the imposition of penalties in addition to the *predicate* offense. In recognition of this, the government implicitly concedes that where, as here, Berrios challenges the § 924(j) sentence based on a conviction for felony murder which was *not* the charged predicate offense, only the consecutive sentence mandate is controlling. Nevertheless, we can see no reason for Congress to differentiate between the extension of the prefatory clause to subsection (j) and the extension of the consecutive sentence mandate, because both are essential to the sentencing scheme.

43

of that provision . . . .'" (quoting *United States v. Mohammed*, 27 F.3d 815, 819-20 (2d Cir. 1994))).

The remainder of subsection (c) then provides a length for the additional mandatory sentence, the severity of which depends on factors delineated in that subsection or elsewhere. *See Abbott*, 574 F.3d at 206-08 (holding that mandatory minimum sentences provided in other provisions of law may apply to increase a subsection (c) punishment). The provisions of subsection (c) provide for greater sentence lengths based upon, for example, actual discharge of the weapon, § 924(c)(1)(A)(iii), or the use of a machinegun, § 924(c)(1)(B)(ii). This structure extends to § 924 (j): like the rest of subsection (c), § 924(j) simply provides an additional circumstance beyond the existence of the predicate offense – namely, where a subsection (c) violation results in the death of a person – that governs the length of a sentence to be imposed. *See* 18 U.S.C. § 924(j) (varying sentence lengths depending on whether death results from murder or manslaughter). Understood in the context of the statutory scheme, section 924(j) effectively functions as an extension of subsection (c)'s statutory core. And in light of the subsection (c) cross-reference, Congress's intent to treat it as such is clear. With the statutory scheme firmly in mind, we turn to the double jeopardy issue.

2. The Consecutive Sentence Mandate

Berrios's principal argument is that § 924(j) lacks any indication that a sentence is to be stacked on top of his other offenses, and therefore the requisite congressional intent is not present. He also observes that the consecutive sentence

44

mandate exclusively applies to a penalty "imposed under" subsection (c), *see* 18 U.S.C. § 924(c)(1)(D)(ii), and contends that a sentence imposed pursuant to a subsection (j) conviction is not "imposed under" subsection (c) because, following the Eleventh Circuit's reasoning in *Julian*, 633 F.3d at 1252-57, subsection (j) constitutes a separate offense. Although the government concedes that § 924(j) establishes a discrete crime from § 924(c), this has no bearing on our decision: we are persuaded that under any reasonable interpretation, 18 U.S.C. 924(j) is subject to the consecutive sentence mandate provided in § 924(c)(1)(D)(ii).

First, in light of Congress's clear intent to stack punishments for all § 924(c) violations, we agree with the Tenth Circuit that "[t]he failure to repeat the prohibition against concurrent sentences set forth in § 924(c)(1)(D)(ii) does not demonstrate that Congress has determined that the penalty set forth in § 924(j) should not be imposed 'in addition to'" any other term of imprisonment. *Battle*, 289 F.3d at 668. After all, the consecutive sentence mandate is the heart of the statutory scheme set forth by subsection (c); its veritable *raison d'être*. *See Gonzales*, 520 U.S. at 9-10. It takes no special insight or leap of logic to conclude that the central reason for Congress's choice of language in writing subsection (j) – "during the course of a violation of subsection (c)" – was to ensure that separating out subsection (j) from subsection (c) did not deprive the law of a coherent sentencing scheme, the heart of which is the consecutive

45

sentence mandate.[16] As we have said before, "[o]nce Congress has clearly stated an intention to stack punishments as it did in section 924(c), 'it need not reiterate that intent in any subsequent statutes that fall within the previously defined class.'" *Bishop*, 66 F.3d at 575 (quoting *United States v. Singleton*, 16 F.3d 1419, 1428 (5th Cir. 1994)).

To interpret the text any other way would give rise to an anomalous result: that "a defendant convicted under § 924(c) is subject to an additional consecutive sentence only in situations that do not result in a death caused by use of a firearm." *Allen*, 247 F.3d at 769; *Battle*, 289 F.3d at 668 (quoting *Allen*, 247 F.3d at 769). We agree with the Eighth and Tenth Circuits that it is highly "unlikely that Congress, which clearly intended to impose additional cumulative punishments for using firearms during violent crimes in cases where no murder occurs, would turn around and not intend to impose cumulative punishments in cases where there are actual murder victims." *Battle*, 289 F.3d at 668 (quoting

---

[16] We find unpersuasive the Eleventh Circuit's reasoning in *Julian*, 633 F.3d at 1255-56, that the contrary interpretation is necessary to avoid rendering superfluous the language of § 924(c)(5), because otherwise, "no difference [would] exist[] between the sentences that these two provisions prescribe[]." In fact, there is a patently obvious difference: § 924(j) requires the death of a person "through the use of a *firearm*," (emphasis added), whereas § 924(c)(5) is based on the use, carrying, or possession of "*armor piercing ammunition*," (emphasis added), which is, of course, not a firearm.

46

*Allen*, 247 F.3d at 769).  In light of the statutory scheme and purpose shared by subsection (c) and subsection (j), we simply cannot impute a contradictory intent to Congress without some underlying rationale.

This reading is supported by our prior interpretation of § 924(c)'s prefatory clause, which instructs that the penalties enumerated in subsection (c) apply "in addition to the punishment provided" for the predicate crime of violence or drug trafficking offense, "except to the extent that a greater minimum sentence is otherwise provided by this subsection *or by any other provision of law*."  18 U.S.C. § 924(c)(1)(A) (emphasis added); *see Abbott*, 574 F.3d at 206-08.  As we discussed in *Abbott*, the prefatory clause's mandatory sentencing scheme is not limited to subsection (c), because "[i]n referring to alternative minimum sentences, the prefatory clause mentions 'any other provision of law' to allow for additional § 924(c) sentences *that may be codified elsewhere in the future . . . .*"  574 F.3d at 208 (emphasis added).  The clause thereby "provides a safety valve that would preserve the applicability of any other provisions that could impose an even greater mandatory minimum consecutive sentence for a violation of § 924(c)."  *United States v. Studifin*, 240 F.3d 415, 423 (4th Cir. 2001).

Although *Abbott* did not place subsection (j) squarely before us at that time, we think that subsection (j) was the unambiguous target of this safety valve.  Accordingly, if Congress wanted to increase the mandatory minimum for a violation of subsection (c) resulting in the death of a person, it could do so in subsection (j) without rewriting the entire statute.  *Cf. Bishop*, 66 F.3d at 575.  Thus, Congress's intent

47

in imposing cumulative punishment on a defendant for both a § 924(c) violation and a predicate offense was not constrained to those penalties provided solely by that subsection. Rather, the consecutive sentence scheme is intended to impose additional punishments for *any* violation of subsection (c), whether the penalties for such violations are provided in that subsection or elsewhere.

Second, we think that Berrios's interpretation of sentences "imposed under" subsection (c) to exclude subsection (j) lacks a firm textual basis and is unduly restrictive in light of the statutory scheme. Of course, "imposed under" *could* refer to only those sentences literally listed in subsection (c), but that is by no means the only possible definition. For instance, Webster's defines "under" as, in part, "subject to regulation by," s*ee* Webster's Third Int'l Dictionary (1989), and so it is equally plausible that a sentence "imposed under" subsection (c) means "subject to regulation by" subsection (c), a definition under which subsection (j) would clearly qualify. But in light of the statutory scheme as a whole, it is apparent that the phrase serves a functional – as opposed to literal – purpose, by identifying those sentences imposed *as a consequence of* a subsection (c) offense: in other words, those sentences handed down for a subsection (c) violation.

Although we decline to follow the Eighth and Tenth Circuits in concluding that subsection (j) merely sets forth sentencing elements to be applied to a subsection (c) offense, *see Battle*, 289 F.3d at 666; *Allen*, 247 F.3d at 769, such a

48

determination is not dispositive.[17]   The sentencing scheme
embodied by subsection (c) does not distinguish between an

---

[17] We acknowledge that our resolution of this issue
would be more straightforward were we to follow the Eighth
and Tenth Circuits in holding that § 924(j) merely provides an
"enhancement" for a § 924(c) offense. *See Battle*, 289 F.3d at
666; *Allen*, 247 F.3d at 769.  Nevertheless, we are persuaded
that such a reading would be inconsistent with the Supreme
Court's analysis of § 924(c) enhancements and offenses in
*Castillo v. United States*, 530 U.S. 120, 124-31 (2000), and
*Harris v. United States*, 536 U.S. 545, 552-56 (2002), as well
as *Jones v. United States*, 526 U.S. 227, 233-52 (1999) –
cases which the Eighth and Tenth Circuits did not address.

In *Castillo*, the Court held that a then-current provision enhancing the mandatory minimum sentence for use of a machinegun during a § 924(c)(1) violation constituted an element of a separate crime rather than a sentencing factor. 530 U.S. at 124-31. The Court reasoned that the use of a machinegun reflected a "great" variation, "both in degree and in kind," from a generic § 924(c) offense, and was unlike "traditional sentencing factors" relating to offender characteristics, such as recidivism. *Id.* at 126. The Court also acknowledged that "treating facts that lead to an increase in the maximum sentence as a sentencing factor would give rise to significant constitutional questions." *Id.* at 124 (citing *Jones*, 526 U.S. at 239-52). Conversely, in *Harris*, 536 U.S. at 556, the Court held that the provisions of § 924(c) increasing the penalty for brandishing or discharging a firearm were sentencing factors, not elements. Those provisions did "not repeat the elements from the principal paragraph" setting forth the offense, raised the minimum sentences in incremental steps, and were premised on "paradigmatic sentencing factor[s]." *Id.* at 552-54.

50

These cases, in conjunction with *Jones*, 526 U.S. at 251-52, where the Court held that "death" constituted an element of an aggravated carjacking offense under 18 U.S.C. § 2119(3), guide us here. We think that the death of a person – a fact more serious than the use of a machinegun in *Castillo* – introduces a "great" variation in degree and in kind from other subsection (c) offenses, and cannot be considered a "traditional sentencing factor." *See* 530 U.S. at 124; *Jones*, 526 U.S. at 233, 243-44. Additionally, just as the significant step up in the mandatory minimum for machinegun use – 25 years – would have posed "significant constitutional questions" if premised on a sentencing factor, *Castillo*, 530 U.S. at 124, exposure to life imprisonment and the death penalty in § 924(j) would as well. *See Jones*, 526 U.S. at 233, 239-52. In sum, these characteristics, in addition to locating § 924(j) in a wholly separate subsection rather than integrating it into § 924(c), strongly suggest that Congress intended the death of a person to be considered an element of a discrete offense – an offense provided by § 924(j).

51

increased sentence provided as a function of a sentencing factor, as in § 924(c)(1)(A)(iii), *see Harris v. United States*, 536 U.S. 545, 552-54 (2002), or an element of a separate offense, as in § 924(c)(1)(B)(ii), *see Castillo v. United States*, 530 U.S. 120, 125-26 (2000).  Nor do we think that, where an offense is defined jointly by two statutory provisions, a sentence can only be "imposed under" one of them.  Rather, we are persuaded that a subsection (j) sentence qualifies as a sentence "imposed under" subsection (c), even though it is also "imposed under" subsection (j), because they are part and parcel of the same statutory scheme, and jointly provide the legal basis for the sentence.  Simply put, because a § 924(j) sentence is imposed on a defendant for violating subsection (c), such a sentence is "imposed under" subsection (c).[18]

---

Nevertheless, we do not think that this is the proper case to decide the question.  First, the government expressly stated at argument that it considered § 924(j) to constitute a separate offense and, consistent with this view, specifically charged a § 924(j) offense in Count Six of the indictment.  Second, in its instructions to the jury, the District Court included the death of a person as an element of the § 924(j) offense, thereby obviating any possibility that the exposure to an increased maximum sentence compromised due process, which would be the central issue implicated by our decision. *See Jones*, 526 U.S. at 232.

[18] This is also consistent with the indictment, which charged Berrios with a violation of § 924(c) along with a violation of § 924(j).

We find the Eleventh Circuit's reasoning to the contrary unpersuasive. *See Julian*, 633 F.3d at 1253. In concluding that a subsection (j) penalty is not "imposed under" subsection (c) because subsection (j) "provided [defendant's] sentence," the Eleventh Circuit looked to "decisions of our sister circuits that have declined to read section 924(o), which punishes 'conspir[acies] to commit an offense under subsection (c),' as requiring consecutive sentences." *Id.* But neither *United States v. Clay*, 579 F.3d 919, 933 (8th Cir. 2009), nor *United States v. Stubbs*, 279 F.3d 402, 405-09 (6th Cir. 2002), *overruled on other grounds by United States v. Helton*, 349 F.3d 295, 299 (6th Cir. 2003), the two cases on which *Julian* relies, are analogous. In those cases, the defendant was *charged and convicted* of a § 924(o) offense, but *sentenced* under § 924(c), thereby posing a severe problem under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *See Stubbs*, 279 F.3d at 408-09. Here, on the other hand, as in *Julian*, the defendant was convicted and sentenced under the same provision, § 924(j), thereby implicating none of the concerns underlying those decisions. Moreover, § 924(o)'s relationship to § 924(c) is easily distinguishable from that of § 924(j): § 924(o) creates a conspiracy offense, which is by nature inchoate, and therefore *does not require* that the defendant actually commit the underlying crime. *See Iannelli v. United States*, 420 U.S. 770, 777 (1975). In that regard, a § 924(o) sentence, *unlike § 924(j)*, is in no way dependent on a § 924(c) *violation*, and therefore provides no guidance for our analysis here.

Based on our reading of the statutory scheme, we conclude that Congress intended a defendant who violates

53

subsection (c) to be subject to enhanced sentences by virtue of the consecutive sentence mandate. A defendant who violates subsection (j) by definition violates subsection (c), and therefore is subject to the mandate, regardless of whether § 924(j) constitutes a discrete criminal offense from § 924(c). And when Congress required proof of a § 924(c) violation before imposing the penalties listed under § 924(j), it intended to include a subsection (j) penalty within the scope of those sentences "imposed under" subsection (c). Finding that Congress clearly intended to impose cumulative punishment for a violation of subsection (j) and any other offense, *see Albernaz*, 450 U.S. at 344, we reject Berrios's double jeopardy challenge accordingly.

## IV.

For the foregoing reasons, we will affirm the judgments of conviction and sentence.