J-S74011-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CHARLES ALEXANDER, | |
| Appellant | No. 2849 EDA 2013 |

Appeal from the PCRA Order Entered September 11, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-1000871-1998

BEFORE:  BENDER, P.J.E., DONOHUE, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:　　　　　　**FILED JANUARY 21, 2015**

Appellant, Charles Alexander, appeals from the order entered September 11, 2013, denying his first post-conviction relief petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.  Appellant raises multiple claims alleging the ineffective assistance of trial and appellate counsel and, relatedly, that the PCRA court erred in dismissing his PCRA petition without an evidentiary hearing.  After careful review, we affirm.

The PCRA Court summarized the facts underlying Appellant's conviction for first degree murder and related offenses as follows:

> In July, 1997, a dispute over drug territory between Appellant's codefendant, Kareem Morefield, and Decedent, Benjamin

---

[*] Retired Senior Judge assigned to the Superior Court.

Singleton, escalated to gunfire that ultimately led to Appellant's contract killing of … [D]ecedent on April 20, 1998 for the sum of two thousand dollars ($2,000). Decedent and Morefield were competing drug dealers with a history of animosity and violence. Morefield and his companions, Darryl Booker and Greg Robinson, were selling drugs from a house on the 2300 block of Beechwood Street, Philadelphia, PA. Morefield believed that Decedent, who sold drugs at a nearby intersection, had designs on taking over drug sales in the area. On July 22, 1997, Morefield met with Decedent on the corner near Decedent's mother's home on the 400 block of East Collum Street, Philadelphia, PA. A conversation ensued concerning threats made to Decedent by Morefield's associates, and concerning the rumors that the victim intended to take over drug trafficking. There was no resolution of the dispute and the two left the scene, Morefield entering the nearby home of one of his associate's mother, and Decedent walking around the next corner. Decedent's sister was observing from her front door and she testified that Morefield and Booker, carrying firearms[,] followed Decedent. She then heard gunshots [and] observed Decedent run[ning] back to the house screaming that he had been shot and that Morefield shot him. Decedent was shot in the leg and abdomen and was taken to the hospital[,] requiring extensive surgery and several months of treatment. Decedent was later released from the hospital and Morefield told Booker that he would finish the job he started; further stating that he wanted Decedent dead.

On April 20, 1998, [at] approximately 8:00 PM, Morefield and his associates were selling drugs from a house near 18th and Cumberland Streets when Decedent and Appellant came in, ostensibly looking for a mutual friend. Shortly thereafter, Lamont Hill, who lived nearby[,] testified that he was in his bedroom and heard multiple gunshots from the street below. When he looked out of his window he observed two men running, enter into Appellant's gold Hyundai Excel, and the men fled. One of the males was carrying a gun. Hill went outside and found Decedent lying face down in the street in a pool of blood. Decedent had been shot nine times with nine millimeter bullets.

Robert Herring, Decedent's friend, testified that after the shooting Morefield warned him to keep quiet about the shooting. Morefield also confided to Darryl Booker that he paid the shooter two thousand dollars ($2,000) to kill Decedent. In his conversation with Booker, Morefield accurately described the

events of the shooting and the scene of the crime. Morefield further remarked to Booker that he paid half of the shooter[']s bail in connection with this case.

PCRA Court Opinion (PCO), 2/4/14, 2-4 (internal citations and footnotes omitted).

Appellant's first trial, a non-jury proceeding before the Honorable William J. Mazzola, began on May 13, 2003. Before the trial concluded, Judge Mazzola became ill, resulting in a three-month postponement. When Judge Mazzola returned on September 8, 2003, he declared a mistrial, *sua sponte*, due to his health problems. A second trial began on January 26, 2004, before the Honorable Renee Cardwell Hughes, at which Appellant elected to be tried by a jury. Appellant's second trial was held jointly with codefendant Morefield.[1]

On February 4, 2004, the jury convicted Appellant (and Morefield) of first degree murder and conspiracy. Additionally, the jury convicted Appellant of possessing an instrument of crime. On that same day, the trial court sentenced Appellant to a mandatory term of life imprisonment for first degree murder, and no further penalty as to the remaining counts.

Appellant filed a direct appeal, but this Court found all of his appellate claims waived after he failed to raise them in his Pa.R.A.P. 1925(b) statement. **See Commonwealth v. Alexander**, 897 A.2d 513 (Pa. Super.

_____

[1] Hereinafter, references to Appellant's "trial" refer specifically to his second trial, and references to "the trial court" refer specifically to Judge Hughes, unless otherwise noted.

2006) (unpublished memorandum). Appellant subsequently filed a successful PCRA petition seeking reinstatement of his direct appellate rights *nunc pro tunc*. In his second direct appeal, Appellant presented a single question for our review. This Court rejected that claim on its merits, affirmed Appellant's judgment of sentence, and our Supreme Court subsequently rejected his petition for allowance of appeal. ***See Commonwealth v. Alexander***, 981 A.2d 910 (Pa. Super. 2010) (unpublished memorandum), *appeal denied*, 992 A.2d 885 (Pa. 2010).

On March 21, 2011, Appellant filed a timely PCRA petition.[2] Counsel was appointed, and Appellant then filed a counseled, amended PCRA petition on October 17, 2012 (hereinafter, "the Petition"). The Commonwealth subsequently filed a motion to dismiss the Petition without a hearing, and Appellant filed a timely response. The PCRA court issued a Pa.R.Crim.P. 907 notice of its intent to dismiss the Petition without a hearing on July 16, 2013. Following Appellant's timely response on August 5, 2013, the PCRA court entered an order dismissing the Petition on September 11, 2013. On October 7, 2013, Appellant filed a timely notice of appeal from that order, and filed a timely Pa.R.A.P. 1925(b) statement on November 6, 2013. The PCRA court issued its Rule 1925(a) opinion on February 4, 2014.

Appellant now presents the following questions for our review:

---

[2] This was Appellant's second PCRA petition, but his first following the reinstatement of his direct appellate rights.

I. Were [both] trial counsel ineffective for failing to object to the declaration of a mistrial at Petitioner's first trial and for failing to object to the second trial as a violation of the federal and state constitutional protections against double jeopardy?

II. Did trial counsel render ineffective assistance by failing to make the correct and proper objections to the constitutionally insufficient redaction of Darryl Booker's prior recorded testimony and of the statements by non-testifying co[]defendant Morefield contained therein, and to the highly prejudicial instructions by the Court and argument by the prosecution related thereto?

III. Was trial counsel ineffective for failing to interview or call as a witness Gregory Robinson, who would have testified that the conversation between himself, Booker and Petitioner's co[]defendant Morefield — as described in Booker's prior recorded testimony — never took place?

IV. Was trial counsel ineffective for failing to make the proper objections to the admission of evidence concerning an assault upon the witness Robert Herring and the witness's belief that Petitioner procured it, where the evidence was insufficient to tie Petitioner to the occurrence, where the witness's beliefs were irrelevant given that he in fact testified favorably to the Commonwealth, and where the Commonwealth blatantly flaunted the Trial Court's in limine ruling setting limits upon said evidence?

V. Was trial counsel also ineffective for failing to request an appropriate cautionary instruction in light of the Trial Court's in limine ruling restricting the evidence concerning the assault to its relevance for Herring's state of mind?

VI. Was trial counsel ineffective for failing to use readily available impeachment evidence in his cross examination of Robert Herring and Carlton Gerald?

VII. Was trial counsel ineffective for failing to make the correct objections as bases for his motion for mistrial following the prosecutor's inflammatory closing argument to the jury?

VIII. Did direct appeal counsel render[] ineffective assistance by failing to raise the Trial Court's error in permitting the use of Darryl Booker's prior recorded testimony, where the

Commonwealth failed to make a good faith effort to find him?

IX. For purposes of evaluating prejudice, must a court consider the cumulative effects of the various constitutional errors demonstrated?

X. Did the Court below err[] by failing to afford Petitioner an evidentiary hearing?

Appellant's Brief, at 2-4.

Here, Appellant's PCRA claims were denied without a hearing pursuant to Pa.R.Crim.P. 907. Our standard of review for this matter is well-settled:

In reviewing the propriety of a PCRA court's order dismissing a PCRA petition, we are limited to determining whether the PCRA court's findings are supported by the record and whether the order in question is free of legal error. *Commonwealth v. Ragan*, 592 Pa. 217, 220, 923 A.2d 1169, 1170 (2007). The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record. *Commonwealth v. Spencer*, 892 A.2d 840, 841 (Pa. Super. 2006) (citation omitted). Moreover, "[t]here is no absolute right to an evidentiary hearing on a PCRA petition, and if the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary." *Commonwealth v. Jones*, 942 A.2d 903, 906 (Pa. Super. 2008), *appeal denied*, 956 A.2d 433 (Pa. 2008) (citing *Commonwealth v. Barbosa*, 819 A.2d 81 (Pa. Super. 2003)); Pa.R.Crim.P. 907(2). A reviewing court must examine the issues raised in the PCRA petition in light of the record in order to determine whether the PCRA court erred in concluding that there were no genuine issues of material fact and in denying relief without an evidentiary hearing. *Commonwealth v. Jordan*, 772 A.2d 1011, 1014 (Pa. Super. 2001) (citation omitted).

*Commonwealth v. Springer*, 961 A.2d 1262, 1264 (Pa. Super. 2008).

Appellant asserts multiple claims of the ineffective assistance of counsel (IAC) that occurred during various stages of his trial and direct appeal.

- 6 -

Our standard of review when faced with a claim of ineffective assistance of counsel is well settled. First, we note that counsel is presumed to be effective and the burden of demonstrating ineffectiveness rests on [the] appellant. *Commonwealth v. Thomas*, 783 A.2d 328, 332 (Pa. Super. 2001) (citation omitted). In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Turetsky*, 925 A.2d 876, 880 (Pa. Super. 2007). A petitioner must show (1) that the underlying claim has merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors or omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Id.* (citation omitted). The failure to prove any one of the three prongs results in the failure of petitioner's claim.

*Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010).

### I.

Appellant's first claim concerns the mistrial declared by Judge Mazzola during Appellant's first trial. Appellant asserts that his trial counsel during that first trial was ineffective for failing to object to Judge Mazzola's declaration of a mistrial. Additionally, he claims that his attorney during his second trial was ineffective for failing to object to the second trial as a violation of Appellant's state and federal double jeopardy rights. Both of these issues turn on the question of whether Judge Mazzola's declaration of a mistrial was a manifest necessity.

It is within the trial judge's discretion to declare a mistrial, and, absent an abuse of that discretion, no reversal of its exercise will result. Nonetheless, a judge may declare a mistrial *sua sponte* only when manifestly necessary or where the ends of public justice would otherwise be defeated. Where there is

"manifest necessity" for a trial judge to declare a mistrial *sua sponte*, neither the Fifth Amendment to the United States Constitution nor Article I, § 10 of the Pennsylvania Constitution will bar retrial. However, any doubt about the manifest necessity of declaring a mistrial must be resolved in the defendant's favor.

Reviewing courts use no mechanical formula in determining whether a trial court had a manifest need to declare a mistrial. Rather, "...varying and often unique situations aris[e] during the course of a criminal trial...[and] the broad discretion reserved to the trial judge in such circumstances has been consistently reiterated...." ***Illinois v. Somerville***, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973). Far more conversant with the factors relevant to the determination than any reviewing court can possibly be, the trial judge, who is the foremost authority in his or her courtroom, is usually best-positioned to determine the necessity of recusal in any individual case. This principle assumes great weight when the issue involves how the presentation of evidence or the conduct of parties affects a trial's fact-finder.

When judges doubt their own ability to adjudicate impartially, they should recuse themselves. Such an inability to be objective creates a manifest necessity for the declaration of a mistrial, particularly when a judge must exert the broad discretion that a bench trial demands.

***Commonwealth v. Leister***, 712 A.2d 332, 334-35 (Pa. Super. 1998).

Here, the PCRA court states that "Judge Mazzola indicated that he considered all other less drastic alternatives to mistrial, but that his illness and current medicine regimen, coupled with the passage of time that affected his recall of the evidence and witness credibility, demanded that a mistrial be declared." PCO, at 5. Appellant avers that there was no manifest necessity requiring Judge Mazzola to declare a mistrial because neither Appellant nor his codefendant requested a mistrial, and Judge Mazzola's impartiality had not been called into question. Furthermore,

- 8 -

Appellant argues that because the trial was substantially complete, Judge Mazzola should have waited to see if his memory was adequately refreshed by the notes of testimony, which had yet to be produced at the time he declared the mistrial. Appellant contends that his first trial counsel should have objected to the Court's *sua sponte* declaration of a mistrial on any or all of these bases.

We conclude that there could be no arguable merit to the proposed objections. Here, Judge Mazzola was presiding over a bench trial. As such, he was sitting in the place of a jury as the factfinder, and his recollection of the testimony and evidence presented before the delay in proceedings was of paramount concern affecting the fairness of the trial, regardless of his impartiality. Appellant's arguments would be far more compelling if Judge Mazzola had been presiding over a jury trial because it would have been the jury's recall of the evidence and testimony that would be at issue, not the judge's.

Furthermore, Appellant has not convinced us that the notes of testimony in these circumstances could have adequately refreshed Judge Mazzola's memory so as to obviate the manifest necessity justifying the mistrial. Judge Mazzola's recollection difficulties were not solely caused by the passage of time. He also stated that the nature of his illness, as well as the pharmaceuticals he was taking to treat it, had impaired his memory. Judge Mazzola was in the best position and, perhaps, the only position, to

adequately assess his ability to perform his duties in light of his illness and medicinal regime.

As cited above, our review of the *sua sponte* declaration of a mistrial is not mechanistic, and the trial court is imparted with "broad discretion" to address the unique circumstances that may arise during the course of criminal trials. **Id.** at 335 (quoting **Somerville**). Although we acknowledge that "any doubt about the manifest necessity of declaring a mistrial must be resolved in the defendant's favor," Appellant has not cited any controlling authority that would give us pause regarding whether there was a less drastic remedy available to deal with Judge Mazzola's predicament. **Id.** Consequently, we ascertain no abuse of discretion in Judge Mazzola's decision to declare a mistrial and, therefore, no arguable merit to any claim that an objection should have been lodged by counsel. Accordingly, we conclude that the PCRA court's determination to dismiss this claim without a hearing was legally correct and supported by the record, because Judge Mazzola's *sua sponte* declaration of a mistrial was a manifest necessity.

We also ascertain no prejudice resulting from subsequent defense counsel's failure to object to Appellant's second trial on double jeopardy grounds. **See Commonwealth v. Diehl**, 615 A.2d 690, 691 (Pa. 1992) ("Since Justice Story's 1824 opinion in **United States v. Perez**, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 [(1824)], it has been well settled that the question whether under the Double Jeopardy Clause there can be a new trial after a mistrial has been declared without the defendant's request or consent

depends on where there is a manifest necessity for the mistrial, or the ends of public justice would otherwise be defeated."). Thus, we conclude that the PCRA court's dismissal of this claim is supported by the record and free of legal error.

## II.

Next, Appellant claims that his (second) trial attorney[3] was ineffective for failing to *adequately* object to both the admission, and the accompanying cautionary instruction, of the prior recorded testimony of Darryl Booker ("Booker's Recorded Testimony"). More specifically, Appellant contends 1) that Booker's Recorded Testimony was completely inadmissible against Appellant under **Bruton v. United States**, 391 U.S. 123 (1968); 2) the redaction of references to Appellant's name in Booker's Recorded Testimony as presented to the jury did not comply with the exception(s) to **Bruton** provided by **Richardson v. Marsh**, 481 U.S. 200 (1987), and its progeny; 3) although trial counsel objected to the admission of Booker's Recorded Testimony, he was ineffective for not objecting to the inadequacy of the redaction; and 4) trial counsel was also ineffective for not objecting to the adequacy of the cautionary instruction issued by the trial court that accompanied the admission of the redacted version of Booker's Recorded Testimony.

---

[3] This and all subsequent references to Appellant's trial counsel refer exclusively to Appellant's attorney during his second trial.

Booker testified at Morefield's preliminary hearing. However, Booker was unavailable to testify at the time of Appellant's joint trial with Morefield, and Appellant never had the opportunity to cross-examine Booker regarding that testimony. Booker's Recorded Testimony concerned his account of a conversation he had with Morefield after the victim was killed. Morefield told Booker that he had hired Appellant to kill the victim in exchange for $2000. Morefield also told Booker several details about the killing that were unlikely to be known by anyone other than the perpetrators.

Our Supreme Court summarized the applicable jurisprudence relating to the admissibility of a codefendant's confession that implicates a defendant at their joint trial in **Commonwealth v. Brown**, 925 A.2d 147 (Pa. 2007):

> Included in the scope of the right guaranteed by the Sixth Amendment's Confrontation Clause is the right to cross-examine witnesses. **Richardson**, 481 U.S. at 206…. Generally, at a joint trial, a witness's testimony is not considered to be " against" a defendant if an instruction is given to the jury to consider that evidence only against a co[]defendant. **Id.** The general presumption in the law is that juries will abide by such instructions. [**Commonwealth v.**] **McCrae**, 832 A.2d [1026,] 1037 [(Pa. 2003)]; [**Commonwealth v.**] **Travers**, 768 A.2d [845,] 847 [(Pa. 2001)]. In **Bruton**, however, the U.S. Supreme Court recognized that there are some instances where "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." **Bruton**, 391 U.S. at 135…. The **Bruton** Court held that, if a nontestifying co[]defendant's confession directly and powerfully implicates the defendant in the crime, then an instruction to the jury to consider the evidence only against the co[]defendant is insufficient, essentially as a matter of law, to protect the defendant's confrontation rights. **Id.** at 135–37…; **Gray** [**v. Maryland**], 523 U.S. [185,] 192 [(1998)] (citing **Richardson**, 481 U.S. at 207…).

> *Bruton*, however, is not the last word from the Court concerning how to treat co[]defendant statements in joint trials. In *Richardson v. Marsh*, the Supreme Court held that the Confrontation Clause is not violated by the "admission of a non-testifying co[]defendant's confession with a proper limiting instruction when … the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. at 211…. This Court had previously approved of such a practice in the wake of *Bruton*. *See Commonwealth v. Johnson*, … 378 A.2d 859, 860 ([Pa.] 1977). We have also held that substituting the neutral phrase "the guy" … for the name of the defendant is an appropriate manner of redaction under *Bruton*. *Travers*, 768 A.2d at 851.

*Brown*, 925 A.2d at 157.

As a threshold matter, we address the Commonwealth's assertion that *Bruton* is not implicated by the admission of Booker's Recorded Testimony. Clearly, Morefield's statements to Booker were inculpatory with respect to both himself and Appellant. However, the Commonwealth argues:

> Any finding of *Bruton* error necessarily also requires an initial determination that the Confrontation Clause applies, as determined by *Crawford v. Washington*, 541 U.S. 36 (2004), and subsequent decisions articulating the scope of the Confrontation Clause. Under *Crawford*, confrontation concerns arise only from testimonial hearsay, such as statements to police during questioning or actual testimony. *Crawford*[,] 541 U.S. at 51-52. *Accord United States v. Berrios*, 676 F.3d 118, 128 (3d Cir. 2012) ("[B]ecause *Bruton* is no more than a by-product of the Confrontation Clause, the Court's holdings in *Davis v. Washington*, 547 U.S. 813 (2006), and *Crawford* … likewise limit *Bruton* to testimonial statements.").

Commonwealth's Brief, at 24. Although *Berrios* is not controlling authority, we find it highly persuasive in this instance, for the following reasons.

Clearly, Booker's Recorded Testimony, *per se*, does not implicate *Bruton*, because Booker was not a codefendant in Appellant's trial.

- 13 -

However, Appellant correctly notes that in **Bruton**, the testimony at issue came from a postal worker who was not a defendant in the case, but who had testified as to the contents of Bruton's codefendant's confession. Thus, Appellant correctly argues that Booker's status is irrelevant to our inquiry as to the applicability of **Bruton** to the hearsay statement contained within Booker's Recorded Testimony.

Yet, **Bruton** itself is merely an application of the Confrontation Clause, **Bruton**, 391 U.S. at 137 ("Here the introduction of [Bruton's codefendant's] confession posed a substantial threat to [Bruton's] right to confront the witnesses against him, and this is a hazard we cannot ignore."), and **Crawford** effectively limited the application of the Confrontation Clause claims to the admission of "testimonial" evidence. However, the **Crawford** court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" **Crawford**, 541 U.S. at 68. After a series of cases addressing the contours of the Confrontation Clause in the wake of **Crawford**,[4] the Supreme Court appeared to have arrived at a working definition of "testimonial" in **Michigan v. Bryant**, 562 U.S. 344 (2011), but that definition was tailored to statements that were the product of a non-custodial police interrogation. However, just prior to **Bryant**, in **Davis**, a

_____

[4] **See Davis v. Washington**, 547 U.S. 813 (2006); **Hammon v. Indiana**, 547 U.S. 813 (2006); and **Whorton v. Bockting**, 549 U.S. 406 (2007).

case also involving a police interrogation, the Supreme Court acknowledged that statements other than those produced by a police interrogation may be testimonial for Confrontation Clause purposes:

> Our holding refers to interrogations because ... the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial.

*Davis*, 547 U.S. at 822 n. 1.

Our Supreme Court was confronted with the applicability of the Confrontation Clause in a case which did not involve a police or judicial interrogation in *Commonwealth v. Allshouse*, 36 A.3d 163, 167 (Pa. 2012), *cert. denied sub nom.*, *Allshouse v. Pennsylvania*, 133 S.Ct. 2336 (2013) ("*Allshouse II*").[5] At issue in *Allshouse II* was whether a statement given by an injured minor to a Children and Youth Services ("CYS") caseworker regarding Allshouse's culpability, although admissible as an exception to the hearsay rule pursuant to the Tender Years Hearsay Act, 42 Pa.C.S. § 5985.1, was nonetheless barred as violative of Allshouse's Confrontation Clause rights. Our Supreme Court ultimately held that the statement was not testimonial. Applying the test espoused in *Bryant*, our Supreme Court considered whether the primary purpose of the

---

[5] *Commonwealth v. Allshouse*, 985 A.2d 847 (Pa. 2009) ("*Allshouse I*"), had been vacated and remanded to our Supreme Court in light of *Bryant*.

'interrogation' was to "to establish past events for use during a subsequent criminal prosecution." **Allshouse II**, 36 A.3d at 180. Our Supreme Court considered all of the circumstances surrounding that interview and concluded that it was not. Therefore, the Confrontation Clause was held not to bar admission of the minor victim's statement at Allshouse's trial.[6]

With these precedents in mind, we agree with the Commonwealth that the Third Circuit's decision in **Berrios** accurately assesses that **Bruton** claims only arise where the Confrontation Cause is implicated *by the statement sought to be precluded by **Bruton***. **See Berrios**, **supra**; **accord United States v. Johnson**, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause, the **Bruton** rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."); **United States v. Vargas**, 570 F.3d 1004, 1009 (8th Cir. 2009) (holding that **Bruton** does not apply to codefendant's nontestimonial statements); **United States v. Pike**, 292 Fed.Appx. 108, 112 (2d Cir. 2008) (holding that a statement by a codefendant to his fellow inmate was not testimonial because he "would have had no reason to believe it would be used in a

_____

[6] Regarding another statement admitted under the tender years exception, one made by the minor victim to a doctor, our Supreme Court noted that consideration of the statement's testimonial or nontestimonial nature under **Bryant** was more difficult. However, the Court avoided addressing the matter by concluding that the statement's admission was harmless error because its content was merely cumulative of the victim's statement to the CYS caseworker.

judicial proceeding[;]" thus, its admission did not violate either **Crawford** or **Bruton**).

Confessions are usually testimonial statements within the meaning of **Crawford** because they are typically statements given to law enforcement or, albeit less frequently, before judicial officers.  Arguably, a "confession" under the broadest possible definition of that term could include nontestimonial statements (such as "I *confessed* my guilt to my parents," or "I *confessed* my sin to the preacher").  However, we do not believe that "confessions" of that nature were those contemplated in **Bruton**, wherein the at-issue statement was made under an interrogation while Bruton was in custody (even though the interrogator was not a law enforcement official). As **Crawford**, **Davis**, and **Bryant** imply, the types of confessions that are addressed by the Confrontation Clause are those that are made in anticipation of, or with the expectation of, future criminal litigation.  These are qualities that are less likely to apply to confessions made outside the context of a criminal investigation or the judicial process, such as confessions made in confidence to a friend, family member, or during counseling with a religious or mental health professional.  Confessions, within the meaning of the Confrontation Clause, must be understood to mean admissions of criminal culpability made in circumstances where the primary purpose of the admission, or the solicitation of that admission, is to establish past events for use during a subsequent criminal prosecution.

There is no evidence in this case that Morefield's statement to Booker was a product of Booker's 'interrogation' of Morefield. To the contrary, the record tends to support the opposite conclusion: Morefield made the statements to Booker under the impression that his admissions would be held in confidence by Booker. Indeed, none of the attendant circumstances present in this case suggest that Morefield intended his statements to establish past events for use during a subsequent criminal prosecution, or that Booker's conversation with Morefield was undertaken by either party for that purpose. Accordingly, we conclude that *Bruton* did not apply to Morefield's statements to Booker, because those statements were not testimonial and, therefore, did not fall under the purview of the Confrontation Clause. Although Booker's Recorded Testimony itself fell within the purview of the Confrontation Clause (because Booker was not present to testify at trial and Appellant did not have an opportunity to cross-examine him), it did not fall under the purview of *Bruton* because Booker was not Appellant's codefendant.

Consequently, we ascertain that the PCRA court's dismissal of Appellant's *Bruton*-related IAC claim was supported by the record and free of legal error. There could be no arguable merit to Appellant's assertion that trial counsel was ineffective for failing to adequately object under *Bruton*, because the *Bruton* rule was inapplicable to the admission of Booker's Recorded Testimony. Accordingly, we do not reach the question of whether Appellant's trial counsel was ineffective for failing to adequately object to the

redactions of Booker's Recorded Testimony, or to the trial court's cautionary instruction regarding the redacted testimony, as both of those subsidiary claims are premised upon the applicability of *Bruton*.

## III.

Next, Appellant contends that trial counsel failed to interview or call Gregory Robinson to testify on Appellant's behalf. Appellant maintains that Robinson would have testified that the conversation between Booker and Morefield, memorialized in Booker's Recorded Testimony, never took place. Appellant argues that counsel's failure in this regard clearly prejudiced him, because it was a foregone "opportunity to directly contradict the cold, prior testimony of such a witness, about a series of essentially hearsay admissions, *with a live witness* capable of directly denying that those admission had even been made[.]" Appellant's Brief, at 40 (emphasis in original).

Appellant presents two distinct claims: first, a failure to investigate Robinson as a potential witness; and second, the failure to call Robinson to the stand. However, in his brief, Appellant only discusses and cites legal authority pertaining to the second of these claims. Accordingly, we conclude that Appellant has waived any claim that trial counsel failed to interview or otherwise investigate Robinson as a potential witness and, thus, we confine our consideration to counsel's failure to call Robinson as a defense witness. *See Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006) (holding that "arguments which are not appropriately developed are waived");

*Commonwealth v. Figueroa*, 859 A.2d 793, 800 (holding that the appellant waived a claim by failing "to cite to pertinent authority in developing his argument").

To assess whether trial counsel was ineffective for his failure to call Robinson as a witness, we apply the following standards:

> To establish ineffectiveness for failure to call a witness, Appellant must establish that: (1) the witness existed; (2) the witness was available; (3) counsel was informed of the existence of the witness or counsel should otherwise have known him; (4) the witness was prepared to cooperate and testify for Appellant at trial; and (5) the absence of the testimony prejudiced Appellant so as to deny him a fair trial. A defendant must establish prejudice by demonstrating that he was denied a fair trial because of the absence of the testimony of the proposed witness.

*Commonwealth v. Todd*, 820 A.2d 707, 712 (Pa. Super. 2003) (quoting

*Commonwealth v. Khalil*, 806 A.2d 415, 422 (Pa. Super. 2002)).

The PCRA Court found Appellant's claim "waived and without merit." PCO, at 6. The Court explained:

> At trial, the court conducted a colloquy with Appellant in which he was asked if he desired to present any witnesses other than the one witness who had already presented testimony on his behalf. Appellant responded that he did not. Appellant further stated that he did not desire counsel to do anything further in this regard. Appellant cannot now claim that trial counsel rendered ineffective assistance for failing to investigate and call an additional witness, Gregory Robinson. Error was not committed.

*Id.* at 6.

The court's analysis is legally deficient and unsupported by any authorities. Appellant's 'desire' to present a witness to refute Booker's

- 20 -

Recorded Testimony is not a dispositive factor in determining whether trial counsel was ineffective for failing to call Robinson as a witness. Robinson was present during the conversation between Booker and Morefield. He was, therefore, a potential witness who could have undermined the credibility of Booker's Recorded Testimony. Appellant's failure to recognize the potential of Robinson's testimony during the court's colloquy is simply irrelevant to the question of whether trial counsel was ineffective for failing to call him. There is no evidence in the record of this case that Robinson's existence was unknown to trial counsel, or that responsibility for counsel's lack of knowledge regarding Robinson was due to Appellant's failure to disclose Robinson's existence.

Nevertheless, we may affirm the PCRA court's denial of Appellant's petition "on any legal ground, regardless of the basis upon which the [PCRA] court relied." *Commonwealth v. Auchmuty*, 799 A.2d 823, 826 n.2 (Pa. Super. 2002). Here, we agree with the Commonwealth that Appellant's trial counsel cannot be ineffective for failing to refute Booker's Recorded Testimony because the jury was instructed not to consider that evidence against Appellant.

"The presumption in our law is that the jury follows instructions." *Commonwealth v. Travaglia*, 661 A.2d 352, 361 (Pa. 1995) (citing *Commonwealth v. Stoltzfus*, 337 A.2d 873, 879 (Pa. 1975)). Prior to the introduction of Booker's Recorded Testimony, the trial court issued a lengthy cautionary instruction, which read, in part, as follows:

> This evidence is to be admissible only against Kareem
> Morefield. It is to be considered solely for the purpose of
> evidence being offered in this proceeding of the Commonwealth
> versus Kareem Morefield.
>
> The prior recorded testimony is not admissible in the case
> of the Commonwealth versus Charles Alexander, and is not
> under any circumstances to be considered as evidence in the
> case of the Commonwealth versus Charles Alexander.

N.T., 1/30/04, at 85.

Given our presumption that the jury followed the trial court's instructions, we are constrained to hold that Appellant could not have been prejudiced by the absence of Robinson's testimony. Appellant could only have been prejudiced by the absence of Robinson's testimony if Booker's Recorded Testimony had been admitted against him. Consequently, we conclude that no prejudice resulted from trial counsel's failure to call Robinson as a witness and, therefore, that he was not denied a fair trial on that basis.

## IV.

Next, Appellant complains that trial counsel was ineffective for failing to object, and/or adequately object, to the admission of evidence concerning an assault of a witness, Robert Herring, who had testified against Appellant and his codefendant. The trial court permitted Herring to testify that he believed that the assault had been motivated by his upcoming testimony against Appellant and Morefield. However, the trial court did not permit the admission of hearsay evidence upon which Herring's belief was purportedly based. Appellant argues that the trial court's decision to exclude that

- 22 -

hearsay evidence was undermined when the prosecutor allegedly elicited from Herring the source of the hearsay statement as well as its substance. Appellant also complains that trial counsel, who did object on hearsay grounds, was ineffective for not also objecting on relevancy grounds.

Appellant directs our attention to the following passages from the direct examination of Herring:

Q [A.D.A. Malone].  Okay. The people who assaulted you — and you can't talk about what they said — but did they say anything to you?

A [Herring].  Yes.

Q.  Based on what they said to you before, during or after the assault, why did you believe that you were assaulted?

A.  For testifying in this case.

N.T., 1/28/04, at 165.

Q. Why did you write two letters to Charles Alexander?

A. Because I got word sent after I was assaulted that they thought that I was going to really tell; beings [*sic*] though that they assaulted me as well.

So, you know, the barber that cuts our hair is on the same block that he was on, we was on two different blocks.  The barber will come over and cut our hair.  So, the barber told me, you know —

MR. SANTAGUIDA [Defense Counsel for Morefield]: Objection.

THE COURT: Sustained ….

BY MR. MALONE:

Q. Without talking about the exact words the barber used, when you had a conversation with the barber, what was you[r] intention?

A. He told me to write a letter.

- 23 -

Q. Listen to what I'm saying.  Don't say what the barber actually said to you —

A. Uh-huh.

Q. — but after you had that conversation, what was going through your mind? What were you planning on doing?

A. Writing — getting a letter to Charles Alexander to let him know that everything was going to be cool.  And, that once I come to Court that I wasn't going to testify against him.

*Id.* at 169-70.

Initially, we reject Appellant's representation of the record in this case. We do not read the above passage as demonstrating that the Commonwealth intentionally elicited the excluded statements.  During the direct examination of Herring, but prior to the above testimony, there was an objection lodged by Appellant's trial counsel when the prosecutor began to broach the subject of what occurred just prior to when Herring was assaulted in prison.  *Id.* at 138.  A discussion ensued in the judge's chambers.  *Id.* at 138-63.  The statement that the prosecutor wished to elicit from Herring was that, just prior to the assault, the three assailants asked Herring, "Do you know Boo?  You don't know him?  Oh, we heard you do."  *Id.* at 140.[7]  The trial court determined that these statements were inadmissible hearsay.  There is nothing within the above-quoted portions of Herring's testimony that demonstrates that the prosecutor was attempting to circumvent the court's ruling.  To the contrary, it appears that the

_____

[7] "Boo" was a nickname or alias used by Morefield.

prosecutor was making every effort to steer Herring away from revealing the excluded statement, as well as from any similar statement by the prison barber. Thus, Appellant's claim that trial counsel should have done more to object to the prosecutor's alleged circumventing of the trial court's ruling is without merit.

Appellant also argues that trial counsel was ineffective for only objecting on hearsay grounds to this portion of Herring's testimony. He contends that counsel should have also objected on relevancy grounds. Herring's belief that Appellant was responsible for the assault was admitted as probative of Herring's state of mind when he wrote two letters to Appellant. In those letters, Herring indicated to Appellant that he did not intend to testify against him. Because those letters were favorable to Appellant as impeachment evidence concerning Herring's trial testimony, the Commonwealth wanted to demonstrate that Herring had an alternative purpose for writing them other than the truth of their contents. Under this theory, the trial court admitted evidence of Herring's belief that he had been assaulted because of his planned testimony in this case. Appellant argues that any reference to the assault should have been excluded as irrelevant, and that trial counsel should have objected on that basis. He believes that the only relevant evidence of Herring's state of mind was whether the Commonwealth had threatened Herring in order to convince him to 'flip' in favor of the Commonwealth, as Herring's prior statements and testimony had been favorable to Appellant.

We disagree. The PCRA court found the evidence admitted by the trial court to be both relevant and admissible. Appellant fails to cite to any authority that would suggest that, when admitting state of mind evidence to explain such a 'flip,' the only relevant evidence is that pertaining to how the party who ultimately secured favorable testimony from a witness may have influenced that witness. Indeed, such a proposition is unreasonable and self-serving. Appellant's trial counsel attacked the credibility of Herring, particularly with respect to his motivations for writing the two letters to Appellant. N.T., 1/27/04, at 108-09. Appellant can hardly complain that his counsel should have objected to the admission of state of mind evidence on relevancy grounds, where the issue of Herring's motivations for writing the letters to Appellant and testifying for the Commonwealth was brought into play by the defense's strategy.

In *Commonwealth v. Carr*, 259 A.2d 165, 167 (Pa. 1969), our Supreme Court acknowledged that "[t]hreats by third persons against public officers or witnesses are not relevant unless it is shown that the defendant is linked in some way to the making of the threats." However, that rule concerns the use of such threats as substantive evidence of guilt; threats may be admissible for another purpose, such as to explain the motivation for a prior inconsistent statement. *Id.* Here, the defense brought into question Herring's prior inconsistent statement, rendering relevant the threats that induced that statement. Thus, Appellant's trial counsel could not have objected on relevancy grounds, as there is no arguable merit to that claim.

Accordingly, we conclude that that the PCRA court's order denying the claim(s) pertaining to this aspect of Herring's testimony was supported by the record and free of legal error.

## V.

Appellant's fifth claim also concerns Herring's testimony regarding his belief that the assault had been prompted in anticipation of his upcoming testimony against Appellant and Morefield. Appellant argues that trial counsel was ineffective for failing to request a cautionary instruction indicating that Herring's testimony regarding the assault was limited in purpose to establishing his state of mind, and that it should not be considered by the jury as substantive evidence of Appellant's consciousness of guilt.

"Evidence of a defendant's prior bad acts is generally inadmissible, and where such evidence is admitted, a defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose." *Commonwealth v. Hutchinson*, 811 A.2d 556, 561 (Pa. 2002). However, "[w]here evidence of a defendant's prior bad acts is merely a fleeting or vague reference, … trial counsel might reasonably decline to object or request a limiting instruction to avoid drawing attention to a reference that might have gone relatively unnoticed by the jury." *Id.* at 561-62.

Because the PCRA court did not hold an evidentiary hearing, we cannot ascertain whether Appellant's trial counsel had a reasonable basis for not requesting such an instruction. The PCRA court concluded that there was no

merit to this claim, reasoning that while there was evidence of an assault, as well as Herring's belief that the assault was related to his involvement in this case, there was no evidence admitted that Appellant had ordered or participated in the assault.

We cannot agree with the PCRA court regarding the arguable merit of this IAC claim. By permitting evidence of the assault, and Herring's belief of its cause, the trial court risked allowing the jury to infer that Herring had been assaulted at the behest of Appellant or Morefield. Consequently, a cautionary instruction should have been requested by trial counsel and granted by the trial court. Nevertheless, we agree with the Commonwealth that, despite trial counsel's failure in this regard, his ineffectiveness was not sufficiently prejudicial so as to warrant relief because there is no reasonable probability that the outcome of Appellant's trial would have been different had trial counsel requested and been granted a limiting instruction.

First, as noted in our discussion of Appellant's preceding claim, the door to evidence concerning Herring's state of mind in making prior inconsistent statements was opened by the defense. Second, substantive evidence of Appellant's consciousness of guilt had already been properly admitted without objection. Herring had already testified that Appellant had threatened to harm him if he did not keep his mouth closed regarding the murder. N.T., 1/28/04, at 106. Thus, even if the jury made the inference that Appellant and/or Morefield were culpable for the assault, such inferential evidence would have been cumulative of similar evidence that

was properly admitted. Third, the jury did not hear any direct evidence concerning the assault on Herring that would indicate that Appellant or his codefendant had ordered it. Given these circumstances, we conclude that it would be extremely unlikely that the jury would have reached a different result had they been given a cautionary instruction accompanying Herring's testimony regarding his assault. Accordingly, we conclude that Appellant is not entitled to relief on this claim.

## VI.

Next, Appellant claims trial counsel was ineffective for not utilizing available impeachment material during the cross-examination of Herring and another witness, Carlton Gerald. Specifically, Appellant complains that trial counsel failed to use impeachment material used by Appellant's previous attorney during the first trial, and that the cross-examination of both witnesses was markedly less effective as a result. Appellant argues that trial counsel was ineffective for not impeaching Herring's testimony with evidence of his three attempted murder charges, and for not impeaching Gerald's testimony with his armed robbery and drug convictions.

Regarding Herring, the PCRA court found that the attempted murder charges were no longer pending against him at Appellant's second trial, as they had been withdrawn on February 28, 2003. Thus, the court concluded that "[e]vidence of those charges was therefore inadmissible and could not be used to impeach Herring. *See*[] ***Commonwealth v. Chmiel***, 889 A.2d 501 (Pa. 2005)." PCO, at 8. We agree.

In **Chmiel**, our Supreme Court reaffirmed that "the veracity of a witness may not be impeached by prior arrests which have not led to convictions." **Chmiel**, 889 A.2d at 534. Appellant argues, however, that this same evidence was permitted during his first trial because "the Commonwealth was free to reinstitute the charges at any time." Appellant's Brief at 47. This argument is unpersuasive, as it is not accompanied by citation to any controlling authority suggesting that such evidence is admissible. Moreover, it is not at all clear that the first trial court was correct in permitting the admission of such evidence; indeed, it appears that such impeachment evidence should not have been admitted, as the charges in question were withdrawn before the first trial. It is illogical to suggest that otherwise inadmissible evidence should be permitted at a second trial simply because such evidence was erroneously admitted at the first.

Regarding Gerald, the PCRA court determined that Appellant was not prejudiced by counsel's failure to impeach. The court explains:

> Gerald testified at the first trial and gave police a signed statement wherein he stated that Morefield offered two thousand dollars ($2,000) for … killing [the Decedent]. He also stated that Booker, Robinson, and Morefield sold drugs together … and that Appellant usually carried a 9 mm pistol and .45 caliber gun. When Gerald testified at the second trial he recanted his prior statements and testimony. He testified that he made up the information or that it was a rumor he heard.

PCO, at 8.

Thus, the PCRA court concluded that Appellant could not demonstrate prejudice where the testimony he contends should have been impeached by

trial counsel "was actually helpful to the defense…." ***Id.*** We agree. Furthermore, Appellant fails to offer any argument addressing the specific basis on which this claim was rejected by the PCRA court. Accordingly, we conclude that the PCRA court's dismissal of these impeachment-based IAC claims was supported by the record and free of legal error.

## VII.

In Appellant's seventh claim, he asserts that trial counsel was ineffective for failing to adequately object to comments made by the prosecutor during the Commonwealth's closing argument, and that if the appropriate objections had been made, a mistrial would have been granted. Appellant alleges that the prosecutor "blatantly attempted to divert the jury from proper consideration of the evidence as to who in fact committed the murder, and invited its decision based instead on raw emotion and the nature of the killing." Appellant's Brief, at 50. In support of this claim, Appellant directs our attention to numerous portions of the prosecutor's closing remarks. He also claims that cumulative prejudice of these remarks undermined his right to a fair trial. We disagree.

> The Commonwealth is entitled to comment during closing arguments on matters that might otherwise be objectionable or even outright misconduct, where such comments constitute fair response to matters raised by the defense, or where they are merely responsive to actual evidence admitted during a trial. ***See Commonwealth v. Trivigno***, 561 Pa. 232, 750 A.2d 243, 249 (2000) (plurality opinion) ("A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel.") (citing ***United States v. Robinson***, 485 U.S. 25, 31, 108 S.Ct. 864, 99

- 31 -

L.Ed.2d 23 (1988)); ***Commonwealth v. Marrero***, 546 Pa. 596, 687 A.2d 1102, 1109 (1996). Furthermore, "prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair." ***Commonwealth v. Jones***, 542 Pa. 464, 668 A.2d 491, 514 (1995).

***Commonwealth v. Culver***, 51 A.3d 866, 876 (Pa. Super. 2012).

We have reviewed all of the remarks highlighted by Appellant, and we conclude, like the PCRA court, that there was no prosecutorial misconduct during the Commonwealth's closing argument. For instance, regarding Appellant's assertion that the prosecutor's comments concerning a "higher power" were improper, we note that defense counsel arguably breached the topic during his closing argument by contending that only a "higher judge" knew the truth of what happened. N.T., 2/3/04, at 191-92. Nevertheless, Appellant contends the prosecutor "perverted" defense counsel's remarks. Yet, read as a whole, there was nothing improper about the prosecutor's comments, regardless of whether they constituted fair response to the defense's closing argument. The prosecutor did not invoke a higher power, but instead instructed the jury to ignore such concerns. The prosecutor summarized his retort to the defense's purported invocation of a higher power by stating: "So don't wait for God to help. This is about earth and this planet and what we call justice on this planet while we are here." N.T., 2/3/04, at 210. There is nothing improper about these remarks. Indeed, these remarks properly directed the jury away from considering religious motivations in reaching their verdict.

Appellant also complains that the prosecutor "falsely suggest[ed] that venire persons had been excused for cause out of fear of retaliation for serving on the jury." Appellant's Brief at 52. We disagree. The passage in question[8] does nothing more than highlight a sad reality that there is often a

_____

[8] This aspect of Appellant's argument concerns the following portions of the prosecutor's closing:

> Do you remember when we were in a bigger group, when it was forty or sixty of you, when you first came in here? Judge Hughes asked a question: Is there anything about the nature of these charges that would make you unable to sit and fairly listen to the evidence in this case? A lot of your colleagues, a lot of your brothers and sisters, raised their cards up. Why did they do that? Why wouldn't they want to be sitting right here in front of the — in front of them and doing a job? Why not? Why did people put their cards up? The same reason that people get cold feet when they have to sit here, when they have to point at them, when they have to talk on the record, and when they have to look at all these people, the same reason.
>
> So remember, Ladies and Gentlemen, you guys are numbers. I mean, I'm talking to you and you are human beings and you are the ones that are going to decide this case, but ultimately, you are numbers. You are juror number one. You are juror number two, three, four, up the list. The lawyers are instructed to destroy your names. You don't have to give your addresses. You only had to give neighborhoods where you live. Do you remember that? Not Robert Herring, not Carlton Gerald. ....

N.T., 2/3/04, at 251-52.

> Imagine you had a 16 year-old son, and your 16 year-old son comes home and tells you that he just saw a murder, that he knows the guy who did it, and he's a ruthless drug dealer. He knows the guy who died. What would you do? What would you do? Would you march him on down to the police station and

*(Footnote Continued Next Page)*

reluctance among the citizenry to get involved in the criminal process, even for jurors who remain relatively anonymous when compared to witnesses. This was a clear effort to contextualize the fears that prompted witnesses like Herring and Gerald to vacillate between positions favoring and disfavoring the Commonwealth's theory of the case, witnesses whose credibility was of significant importance. The prosecutor never stated that potential jurors had actually been dismissed in this case due to a specific fear of retaliation. We view these comments as permissible oratorical flair.

In any event, trial counsel did object to some of the comments made by the prosecutor, and he requested a mistrial on that basis. Appellant contends that more objections should have been made, with better reasoning, and that if such objections had been made, a mistrial would have been granted. We disagree. We have not identified any clear prosecutorial error in the portions of the Commonwealth's closing argument cited by Appellant. All of the statements highlighted by Appellant were either unobjectionable, oratorical flair, or fair response to arguments made by the defense. Accordingly, the PCRA court's dismissal of this claim was supported by the record and free of legal error.

*(Footnote Continued)* ─────────────

> say: All right, Johnny, tell the detectives what you know. Put yourself in this homicide case now. Let's — let them put your name down. Let them put your address down. Would you do it? Maybe some of you would. I don't know.

***Id.*** at 255-56.

## VIII.

Appellant's next claim concerns the performance of his direct appeal counsel, who he claims was ineffective for failing to challenge on appeal the admission of Booker's Recorded Testimony over objections that the Commonwealth failed to make a good faith effort to find him. That issue had been preserved by trial counsel, but abandoned by (both) appellate counsel.

> Appellant alleges:
>
> In this case, the Commonwealth [only] made cursory efforts to locate Booker at the time of the bench trial before Judge Mazzola, but then suspended all efforts until two days prior to Petitioner's second trial, when detectives again began to look for Booker and his mother at a number of different addresses and locations, during daytime hours only, omitting to check the known address of Booker's girlfriend.

Appellant's Brief, at 55-56.

"Where the Commonwealth seeks to admit a missing witness's prior recorded testimony, a 'good faith' effort to locate the witness must be established." *Commonwealth v. Wayne*, 720 A.2d 456, 467 (Pa. 1998) (quoting *Commonwealth v. Jackson*, 344 A.2d 842 (Pa. 1975)). "What constitutes a 'good faith' effort is a matter left to the discretion of the trial court." *Id.*

Here, Police Officer Broderick Mason testified that he checked multiple locations where Booker had previously been known to live and frequent, and did so on multiple occasions. N.T., 1/29/04, at 12-20. Officer Mason knew Booker since 1990. *Id.* at 13. He said he checked all the locations where

he knew Booker had resided or where he "hung out …." *Id.* Booker's brother was contacted and instructed to encourage Booker to contact the police or the district attorney. *Id.* at 18. Based on information regarding the whereabouts of Booker's mother, received from Booker's brother, Officer Mason then visited where the brother had indicated Booker's mother was staying. *Id.* However, he could not locate her there or any information about her living at that location from the property manager. *Id.* at 18-19. Separate searches had been conducted in anticipation of the first trial. *Id.* at 21. However, Officer Mason did not begin looking for Booker again until a few days before the second trial, a few months short of a year from the end of the first trial. *Id.* at 21-22.

Police Officer Michael Rocks also testified that he made efforts to locate Booker beginning a week before the second trial began. *Id.* at 32. Officer Rocks looked for Booker at no less than seven different locations on multiple occasions. *Id.* at 33-35. Officer Rocks inquired if the people he encountered knew Booker, but was unsuccessful in those efforts. *Id.* at 34. Officer Rocks spent several hours at some locations where Booker was known to frequent but was unable to locate him. *Id.* at 36-37. These efforts continued until the day before the second trial. *Id.* at 37.

Based on the testimony of Officers Mason and Rocks, we ascertain no abuse of discretion in the trial court's conclusion that the Commonwealth undertook a good faith effort to secure Booker's presence at Appellant's second trial. Thus, there is no arguable merit to the assertion of direct

appeal counsel's ineffectiveness. Consequently, we agree with the PCRA court's determination that Appellant was not prejudiced by his direct appeal counsel's failure to challenge whether the Commonwealth made a good faith effort to locate Booker, as that determination is supported by the record and free of legal error.

## IX.

In Appellant's ninth claim, he contends that the cumulative prejudice of prior counsels' ineffectiveness dictate that a new trial is warranted. We disagree. We have disposed of all but one of Appellant's IAC claims by either holding that there was no arguable merit to the underlying legal issue or that there was no prejudice resulting from the (in)actions of counsel. Only with respect to Appellant's fifth claim did we ascertain that some degree of prejudice resulted from counsel's ineffective action; nevertheless, therein we concluded that there was no reasonable probability that the outcome of Appellant's trial would have been different had counsel acted effectively. Accordingly, there is no cumulative prejudice for this Court to consider and, therefore, Appellant's cumulative prejudice claim lacks merit. *See Commonwealth v. Sneed*, 45 A.3d 1096, 1117 (Pa. 2012) (holding that "where claims are rejected for lack of arguable merit, there is no basis for an accumulation claim[,]" and, similarly, that there is no basis for an accumulation claim where individual claims have been disposed of for an absence of prejudice).

## X.

In Appellant's final issue, he contends that the PCRA court erred by dismissing his claims without a hearing.

> Under Pennsylvania Rule of Criminal Procedure 909, the PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings." Pa.R.Crim.P. 909(B)(2). "[T]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." **Commonwealth v. D'Amato**, 579 Pa. 490, 856 A.2d 806, 820 (2004).

**Sneed**, 45 A.3d at 1105-06.

Appellant has not alleged any genuine issues of material fact that, if resolved in his favor, would entitle him to relief. Accordingly, we ascertain no abuse of discretion in the PCRA court's dismissal of Appellant's petition without a hearing.

Order **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/21/2015

- 38 -